**In the Matter of Reid SCHER, Debtor.**

**In the Matter of Barry SELMAN, Debtor.**

**Bankruptcy Nos. 80–B–12053, 80–B–11062.**

United States Bankruptcy Court, S. D. New York.

June 16, 1981.

Gerald A. Kagan, New York City, for debtors Reid Scher and Barry Selman.

Albert Togut, New York City, Chapter 13 Trustee for Reid Scher.

Lipsig, Sullivan & Liapakis, P. C., New York City, for New York State Higher Education Dept.; Thomas A. Holman, New York City, of counsel.

New York University, by Ada Meloy, Asst. Gen. Counsel., New York City.

Jeffrey Sapir, Yonkers, N. Y., Chapter 13 Trustee for Barry Selman.

## OPINION

ROY BABITT, Bankruptcy Judge:

The issue common to both of these petitioners is whether their Chapter 13 plans offering minimal payments to their unsecured creditors, the bulk of whom hold student loans, may be confirmed with the at-

tendant benefits flowing from that confirmation.[1]

On December 2, 1980 *Reid Scher* filed his voluntary petition as an eligible Chapter 13 debtor under the applicable provisions of the 1978 Code, 11 U.S.C. §§ 109(e) and 301. He holds a Master's Degree in Social Work which he received in June, 1979 from New York University, and has been continuously employed in his chosen profession since graduation. From August, 1980 he has been employed by the Children's Aid Society, where he earns a gross salary of $14,500. For the previous calendar year his gross salary was $6,215. Mr. Scher is single and has no dependents. His Chapter 13 statement indicates a bi-weekly gross salary of $517.31 which, in terms of net take home is $390.23. He occupies an apartment for which he pays a $288. monthly rental. These, coupled with his other ordinary ex-

penses of living, raise his monthly expenses to $778., leaving him with a balance above expenses of $67.49 a month.[2] Under his proposed Chapter 13 plan, submitted to the court for confirmation, Scher proposed to pay $40.25 per month over three years to his unsecured creditors, or a total of $1,449. The excess of $27.24 per month is to be set aside as an emergency fund. There are no assets available above Scher's exemptions allowed under 11 U.S.C. § 522(d) were his estate to be liquidated in keeping with the design of Chapter 7, 11 U.S.C. §§ 701–707, 721–728.[3] None of these Chapter 7 provisions apply to a Chapter 13 petition. 11 U.S.C. § 103(b) makes this plain.

Scher's schedules disclose $13,173.15 of outstanding unsecured indebtedness. Of this, $10,770.50 or more than 80% constitutes student loans.[4] The remaining

1. These Chapter 13 petitions were filed under the 1978 Bankruptcy Reform Act which was enacted on November 6, 1978. Pub.L. 95–598, 95th Cong., 2d Sess., 92 Stat. 2549. It became effective on October 1, 1979. Section 402(a) of Title IV, 92 Stat. 2682. Unless otherwise noted, references to sections of Title 1 of the 1978 statute—the Code—are cited as 11 U.S.C. § ——. The 1978 Code is in Supplement III to the 1976 edition of the United States Code, Title 11.

2. Debtor's estimated average expenses are:

| | | |
|---|---|---|
| Rent | — | $288.00 |
| Utilities | — | 60.00 |
| Food | — | 200.00 |
| Clothing | — | 40.00 |
| Laundry and cleaning | — | 15.00 |
| Newspapers, books, etc. | — | 20.00 |
| Medical and drugs | — | 20.00 |
| Transportation | — | 65.00 |
| Recreation | — | 30.00 |
| School Tuition | — | 40.00 |
| | | $778.00 |

3. Debtor's Assets

| Description | Value |
|---|---|
| Household Goods | $1,000.00 |
| Wearing Apparel | 1,000.00 |
| $29,000.00 Term Life Insurance | No Cash Value |

Debtor's Exemptions

| Type of Property | Statute Creating the Exemption | Value |
|---|---|---|
| Household Goods | 11 U.S.C. § 522(d) | $1,000.00 |
| Wearing Apparel | 11 U.S.C. § 522(d) | 1,000.00 |

| | | |
|---|---|---|
| [no one item of household goods or wearing apparel exceeds $200.00] | | |
| Possible Income Tax Refunds | 11 U.S.C. § 522(d) | Amount Unknown |
| Life Insurance | 11 U.S.C. § 522(d) | No Cash Value |

4. Debtor's loans were incurred under the two major loan programs available for students engaged in higher education, the National Direct Student Loan Program (NDSL), and the Guaranteed Student Loan Program (GSL).

NDSL was established by the National Defense Education Act of 1958, Pub.L.85–864, 72 Stat. 1581, 20 U.S.C. (1976 ed.) §§ 401–602. Funding and other provisions of the program were transferred to the Higher Education Act of 1965. Pub.L.89–329, 79 Stat. 1219. It is funded by annual federal appropriations of loan capital, matched by institutional funds. A student who borrows from an institutional loan fund does not begin repayment until nine months after the borrower ceases his studies on at least a half-time basis at the institution from which the student borrowed. Interest accrues only during the repayment period at 3% and borrowers may take up to 10 years to repay. See also 20 U.S.C. (1976 ed.) §§ 1087aa–gg.

Mr. Scher's NDSL loan became due in March, 1980, at which time one $90.00 quarterly payment was made.

Congress established the Guaranteed Student Loan (GSL) under the Higher Education Act of 1965, Pub.L.89–329, codified in 20 U.S.C. (1976 ed.) §§ 1071–1087. Under this program, the money is borrowed from a qualified lender and it is guaranteed by either the federal government, a state agency, or a private non-profit organization. Interest accrues at 7% from the

$2,402.65 is basically the amount owing on credit card purchases which, the debtor testified, had been incurred in his effort to meet the student loan payments.[5]

The New York State Higher Education Services Corporation (NYSHESC), and New York University (NYU), filed objections to the confirmation of Scher's plan, 11 U.S.C. § 1324, and both appeared at the confirmation hearing called for by that section, to voice parallel objections. They insisted that confirmation had to be refused for any or all of three expressed reasons: (1) that Scher had not proposed his plan in good faith within the meaning of 11 U.S.C. § 1325(a)(3); (2) that Scher's plan should be rejected for cause within the meaning of 11 U.S.C. § 1307(c), as the repayment scheme envisioned is minimal in amount when measured against the outstanding debt; and (3) that Scher would be unable to make his payments and therefore to "comply with the plan within the meaning of 11 U.S.C. § 1325(a)(6)."

*Barry Selman,* Chapter 13 debtor, filed his petition on July 9, 1980. Like Scher, he, too, is single, is without dependents and is a social worker, having received his degree from Columbia University. Selman is cur-

rently employed in his chosen profession by the Jewish Board of Family and Children's Services. Selman's bi-weekly gross wages, at argument of the objections to confirmation of his plan, were $575.76 per month, from which he netted $422.67. His gross salary in the preceding year was $7,500. From his disposable income, Selman allots $200. to his rent and $700. to other reasonable and necessary living expenses, leaving him $15.79.[6]

His schedules disclose $21,400.00 of unsecured debt, the sum total of which are student loans. His proposed Chapter 13 plan contemplates a $15.00 monthly payment to be made over a three year period, or an aggregate of $540.00. All Selman's properly is claimed to be exempt under 11 U.S.C. § 522(d).[7]

The standing Chapter 13 trustee, authorized by 28 U.S.C. § 586(b), has objected to confirmation of Selman's plan on the same grounds as were voiced by Scher's objecting creditors.[8]

## I.

Resolution of the issue which has surfaced in these cases, and in so many others as will be seen, necessarily depends on the

---

date of the loans but is paid by the government. Here, too, payment generally begins nine months from when the borrower ceases to be at least a half-time student.

For a more detailed discussion of this topic, see *Collection of Student Loans,* 15 Columbia Journal of Law and Social Problems, 317 (1979–80).

**5.** Pages 63–5 of the examination of the debtor conducted by the United States Trustee under 11 U.S.C. §§ 341(a) and 343. This is a United States Trustee pilot district. 11 U.S.C. § 1501(2). That official may examine the debtor under 11 U.S.C. § 15343 for the court may not be present. 11 U.S.C. § 343(c).

**6.** Debtor's estimated average expenses are:

| | | |
|---|---|---|
| Rent | — | $200.00 |
| Utilities | — | 70.00 |
| Food | — | 200.00 |
| Clothing | — | 65.00 |
| Laundry and cleaning | — | 30.00 |
| Newspapers and books, etc. | — | 25.00 |
| Medical and drug expenses | — | 20.00 |
| Insurance (auto) | — | 35.00 |
| Transportation | — | 75.00 |
| Recreation | — | 50.00 |
| Therapy | — | 130.00 |
| | | $900.00 |

**7.** Debtor's Assets

| Description | Value |
|---|---|
| 1970 Volkswagon | $ 500.00 |
| Household Goods | 1,000.00 |
| Wearing Apparel | 1,000.00 |

Debtor's Exemptions

| Type of Property | Statute Creating the Exemption | Value |
|---|---|---|
| Household Goods | 11 U.S.C. § 522(d) | $1,000.00 |
| Wearing Apparel | 11 U.S.C. § 522(d) | 1,000.00 |
| [no one item of household goods or wearing apparel exceeds $200.00] | | |
| 1970 Volkswagon | 11 U.S.C. § 522(d) | 500.00 |
| Possible Income Tax Refunds | 11 U.S.C. § 522(d) | Amount Unknown |

**8.** 28 U.S.C. § 586(b) is one of nine sections in a new Chapter 39 added to Title 28 of the United States Code by Section 224(a) of Title II of the 1978 bankruptcy reform legislation, 92 Stat. 2662. That 28 U.S.C. Chapter 39 deals with the United States Trustee.

construction of the interfacing of the sections which make up Chapter 13 of the 1978 Code, also to be seen. This is so because

"The intrinsic difficulties of language and the emergence after enactment of situations not anticipated by the most gifted legislative imagination, reveal doubts and ambiguities in statutes that compel judicial construction."

Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum.L.Rev. No. 4 at 529 (1947).

But while we certainly start with the words Congress wrote enroute to the ascertainment of their meaning integrated as part of an entire statutory scheme, *Diamond v. Chakrabarty*, 447 U.S. 303, 308, 100 S.Ct. 2204, 2207, 65 L.Ed.2d 144 (1980), it is not inappropriate to consider the antecedents of those words and their relation to other enactments. Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum.L.Rev. No. 4 at 537 (1947).

And so the court first revisits earlier efforts by Congress to provide an alternative to straight bankruptcy.

A. *The Genesis of Code Chapter 13.*

When Congress saw fit during the final years of the last century and the first 79 years of this one to focus its attention on the plight of the financially pressed wageearner, it was not writing on a clean slate. By the Act of June 22, 1874, 18 Stat. 182, Congress amended its 1867 Bankruptcy Act, 14 Stat. 517, to provide, in Section 43, for court supervised compositions in lieu of straight bankruptcy. In *Perry v. Commerce Loan Co.*, 383 U.S. 392, 394–5, 86 S.Ct. 852, 854, 15 L.Ed.2d 827 (1966), the Supreme Court discusses the background of

Chapter XIII (the direct ancestor of Chapter 13 of the 1978 Code) enroute to holding that a bankruptcy discharge would not bar a Chapter XIII extension filed within six years of the discharge. See Riesenfeld, *The Evolution of Modern Bankruptcy Law*, 31 Minn.L.Rev. 401 (1947).

Congress also provided in Section 12(a) of the 1898 Bankruptcy Act, 30 Stat. 544, Section 9096, Barnes Federal Code (1919 ed.), for compositions by bankrupts and for the mode of their confirmation.[9]

Section 12, however, proved unequal to the task envisioned by Congress for the special circumstances of the wage earner whose only hope for the relief given by the section was recourse to his future earnings. A Section 12 composition required acceptance in writing by a majority in number and in amount of all the unsecured creditors. Another problem in this scheme was the requirement that all consideration to be paid to creditors and all moneys necessary to pay priority debts and administration expenses had to be deposited as a condition precedent to confirmation. This requirement, as much as any other, placed Section 12 relief beyond the reach of the average individual wageearner, although it was also available to corporations. The confirmation criteria preceding confirmation by the court fashioned by Section 12(d) were that the plan was in the best interests of the creditors; the plan and its acceptance were in good faith and not made or procured except as Section 12 provided, or not made or procured by any means, promises or acts forbidden; and that the bankrupt was not guilty of any of the acts or failed to perform any of the duties which would be a bar to a bankrupt's discharge.[10] Congress

---

**9.** The 1898 Act was repealed on the close of business September 30, 1979, for on the next day, the 1978 statute took effect. Section 401(a) of the Title IV. However, these earlier provisions continue to control the disposition of 1898 Act cases still being administered. Section 403(a) of Title IV insists that this be so.

There were several amendments to Section 12a between 1898 and 1938 which saw the extensive Chandler amendments. These amendments were made by the Act of June 25, 1910,

36 Stat. 838, and by the Act of May 27, 1926, 44 Stat. 662, 11 U.S.C. (1934 ed.) § 30.

**10.** For an example of the interfacing of the discharge criteria of Section 14 with the confirmation criteria for a Section 12 composition, see *In re Barde*, 207 F. 654 (D.Or.1913), where confirmation was denied because the debtor there fell within the bar of Section 14(b)(2). That section, as it then stood, came into the 1898 Act by the Act of February 5, 1903, 32 Stat. 797, Section 9098(b)(2), Barnes Federal Code (1919 ed.).

thus linked confirmation to the general discharge provisions of the 1898 Act carried in Section 14(b), 11 U.S.C. (1934 ed.) § 32b.

Although Section 12 did not specifically provide for discharge, Section 14(c), as it then read, was made applicable and gave confirmation of a Section 12 composition the effect of a discharge. See generally, Gilbert's *Collier on Bankruptcy*, (4th ed.) p. 247, *et seq.*, (1937).

But the experience with Section 12 compositions revealed inadequacies. The scheme of the statute ignored the problem of the individual consumer wage earner and his secured creditors. There was no provision for a debtor to modify his confirmed Section 12 plan to accommodate changed circumstances occasioned by the depression of the early 1930's. And so, Congress responded to needs not satisfied by Section 12. It enacted Section 74 to the 1898 Act by the Act of March 3, 1933, 47 Stat. 1467, and amended that enactment by the Act of June 7, 1934, 48 Stat. 922, 11 U.S.C. (1934 ed.) § 202. This statute allowed for compositions or extensions offered by individuals, and, as it dealt with the extension of secured debt and the possibility of court authorized postconfirmation change, was seen as an enlightened, flexible scheme for debtor relief. Section 74(g), 11 U.S.C. (1934 ed.) § 202(g), as had Section 12, among other things, required that the plan and its acceptance were "in good faith", a phrase neither defined, nor the subject of a reported opinion. Vagueness in this statute subdued its utility. Neither "extension" nor "composition" was defined, and the availability of a discharge of affected debts was left at loose ends and was immediately questioned.[11] But Congress' insistence in Section 74(e), 11 U.S.C. (1934 ed.) § 202(e), that the debtor deposit all monies, including costs of administration, proved to be the

rock upon which this predecessor of Code Chapter 13 foundered. Eventually Section 74 sank but not before much of what was workable in it was raised and found place in the debtor relief provisions engrafted onto the 1898 Act by the extensive Chandler amendments achieved by the Act of June 22, 1938, 52 Stat. 840.[12]

Although its life was short, Section 74 plays a significant part in the development of the attitude of Congress, "the expositor of the national interest", *Machinists Local v. Labor Board*, 362 U.S. 411, 429, 80 S.Ct. 822, 833, 4 L.Ed.2d 832 (1960), which led to Chapter XIII in 1938 and to Chapter 13 in 1978. While in many ways unsuited to its task, Section 74 was made to work, particularly in Birmingham, Alabama and Chicago, Illinois, by the bold vigor of bankruptcy referees (as they were then styled) who found that more than 50% of their bankruptcy petitions were by wage earners, and who found that to avoid the "stigma" of bankruptcy, the average debtor would prefer to come to an accord with his creditors if "afforded a reasonable opportunity ... to do so." H.Rep.No.1409 at 53.

When, therefore, in 1938, Congress reworked the 1898 Act, it knew of all this and wrote for its time "a carefully matured enactment", *Guessefeldt v. McGrath*, 342 U.S. 308, 319, 72 S.Ct. 338, 344, 96 L.Ed. 342 (1952), to afford a more complete scheme for the wage earner unwilling to be a bankrupt, which statute would remove the vague, uncertain contours of the earlier efforts in this area.

Chapter XIII was thus enacted, Sections 601 *et seq.*, 11 U.S.C. (1940 ed.) §§ 1001 *et seq.*[13] Among other things calculated to make its congenial climate available and more importantly, workable, Chapter XIII was framed to permit the wage earner as

11. Gilbert's *Collier on Bankruptcy* (4th ed.) 1937, ¶ 1580. See also, Note, 33 Colum.L.R. 704 (1933).

12. See. H.Rep.No.1409, 75th Cong., 1st Sess. 49–51 (1937), hereafter cited as H.Rep.No.1409.

13. From time to time, Chapter XIII was amended in the intervening years, generally benignly,

to further the availability of its provisions to more debtors. See, e. g., the Acts of May 13, 1959, 73 Stat. 24, and October 7, 1952, 66 Stat. 437. Discussion of these amendments may be found in H.Rep.No.193 on H.R. 2237, 86th Cong., 1st Sess. 2 (1959), as to the former, and Sen.Rep.No.1395, 82d Cong., 2d Sess. 11 (1952), as to the latter.

defined by Section 606(8) and for whose benefit it was limited, Section 606(6), 11 U.S.C. (1976 ed.) §§ 1006(6), (8), to pay his creditors from his future wages as earned. It authorized extensions or compositions, Section 606(6), permitted the debtor to reject burdensome executory contracts, Section 646, 11 U.S.C. (1976 ed.) § 1046, and in general, streamlined other aspects of this new process.[14] But looming over this "spontaneous flash of Congressional generosity", *Feres v. United States*, 340 U.S. 135, 139, 71 S.Ct. 153, 156, 95 L.Ed. 152 (1950), was a factor which at once chilled the ability of many debtors to achieve the desired ends of Chapter XIII, and placed those seeking what it offered into what amounted to involuntary servitude. Section 652(1), 11 U.S.C. (1976 ed.) § 1052(1), required the unsecured creditors to accept a debtor's plan by the requisite majorities there described, or unanimously, Section 651, 11 U.S.C. (1976 ed.) § 1051, as a condition of confirmation. This factor made it difficult for a debtor to offer less than the total of his debt by way of composition where his creditors were unyielding and forced him to an extension or a period within which to liquidate the total indebtedness.[15] Certainly it was not any provision of Chapter XIII which mandated its use as only an extension vehicle. Indeed, Section 606(6) on its face would deny any such mandate.[16]

But there were other factors which also had an inhibiting effect on those who would otherwise use the Chapter XIII process and which made it a dead letter in most bankruptcy courts.[17] Confirmation of a Chapter XIII plan, as before, was intertwined with provisions of the 1898 Act dealing with the discharge of debts. Section 656(a)(3), 11 U.S.C. (1976 ed.) § 1056(a)(3), mandated refusal of confirmation if the debtor could be denied a discharge were he a bankrupt.[18]

To be sure, Section 660, 11 U.S.C. (1976 ed.) § 1060, did offer the debtor a discharge. But that was far in the future after the debtor had complied with the provisions of his plan "and upon [his] completion of all payments to be made thereunder, ...." But even this act of legislative grace was limited. Unless all creditors had accepted the plan, those who had not but who could not defeat confirmation, Section 652, 11 U.S.C. (1976 ed.) § 1052, would retain their claims if they were of a kind excepted from discharge by Section 17(a), 11 U.S.C. (1976 ed.) § 35(a).[19] What gave this right to unsecured creditors to vote on a debtor's plan the teeth which almost compelled an extension rather than a composition, and which kept debts alive in some cases, were the mandatory requirements of Section 646, 11 U.S.C. (1976 ed.) § 1046, as to what a Chapter XIII plan had to contain. Section 646(1) insisted that a plan had to include provisions "dealing with unsecured debts generally."

Finally, in this excursion through the clearly charted waters of Chapter XIII of the 1898 Act, it is necessary to touch on a relatively uncharted shoreline of that statutory scheme because it plays a large part in what has come about under Chapter 13 of the 1978 Code.

---

14. H.Rep.No.1409 at 52–55.

15. The 1964 statistics from the Administrative Office of the United States Courts reveal that 95% of all funds paid to creditors in Chapter XIII cases were derived from extension plans, not compositions. See *Perry v. Commercial Loan Co.*, 383 U.S. 397 (1966), fn. 4 at 396.

16. Stanley & Girth, Bankruptcy: *Problem, Process, Reform* (1971), note 1 at 102. Hereafter this work will be cited as Brookings Report.

17. Brookings Report, note 1 at 74.

18. Section 14(c), 11 U.S.C. (1976 ed.) § 32(c), *described the grounds upon which a bankrupt's discharge could be barred.*

19. Although Rule 13–404(a) of the 1978 Bankruptcy Rules, 411 U.S. 1179, at first blush seems more generous than Section 660, its statutory analogue, the Advisory Committee Note, disclaims any position as to Section 14(c), but the context is plainly to Section 17(a) non-dischargeable debts. In any event, the rules are procedural and by the authority of 28 U.S.C. § 2075 could not achieve substantive changes in what Congress wrote. See, *In the Matter of King Resources Co. et ano. v. Phoenix Resources Co.*, 651 F.2d 1349 (10th Cir. 1981).

One of the conditions precedent to confirmation of a Chapter XIII plan was that spelled out by Section 656(a)(4), 11 U.S.C. (1976 ed.) § 1056(a)(4), that

"the proposal and its acceptance are in good faith and have not been made or procured by any means, promises, or acts forbidden by this Act." [20]

"Good faith" was not defined by the Act and the judicial gloss on these words in the context of their use as a common thread in debtor rehabilitation statutes has not quantified the amount a debtor had to pay to satisfy the "good faith" of a plan.

For an extensive skeining of this common thread in the substantive law of bankruptcy, see *In re Victory Construction Co., Inc.,* 9 B.R. 549, 3 C.B.C.2d 655 (Bkrtcy.C.D.Cal. 1981, Ordin, B. J.). Generally, however, the courts stressed the conduct of the debtor, and whether the statutory scheme had been subverted.[21] What seems clear is that the substantiality of the debtor's proposed payment to creditors was not held to be an element of "good faith", largely, it must be assumed, because plans were submitted to creditors for their approval and it made good sense that courts not second guess the creditors who, after all, were in the best position to know whether the offer made by the debtor was in their "best interests". The "best interests" of creditors was also a condition of confirmation of cases under

Chapters XI, XII and XIII of the 1898 Act, but not of Chapter X.[22]

Basically, this is how Chapter XIII stood when, 35 years later, Congress began to turn its attention to bankruptcy in light of a nation dramatically altered by all kinds of events and ideas in the years after 1938.

### B. *Student Loans and Bankruptcy*

Before 1976, unpaid student loans were not the subject of special treatment when the borrower filed a bankruptcy petition. Section 17(a) of the 1898 Act, 11 U.S.C. (1976 ed.) § 35(a), described the kinds of debts which survived and were therefore outside the reach of the discharge provided for by Section 14, 11 U.S.C. (1976 ed.) § 32. These did not include student loans. By 1973, abuses in the use of the bankruptcy process to eliminate student loans had surfaced, and by the Act of October 12, 1976, Section 127(a), Pub.L.94–482, 94th Cong., 2d Sess., Congress responded to the moods of those troubled by the use of the bankruptcy discharge process to extinguish unpaid student loans. By that statute, 20 U.S.C. (1976 ed.) § 1087–3(a), student loans would survive a discharge in bankruptcy unless the discharge were granted after

"the five-year period . . . beginning on the date of commencement of the repayment period of such loan, . . .".

This provision was softened where undue hardship might result.[23] *Matter of Kohn;*

**20.** This standard was required in identical words in Chapter X cases, Section 221(3), 11 U.S.C. (1976 ed.) § 621(3), Chapter XI cases, Section 366(4), 11 U.S.C. (1976 ed.) § 766(4), and in Chapter XII cases, Section 472(4), 11 U.S.C. (1976 ed.) § 872(4), all under the 1898 Act. The 1978 Code, in its Chapter 11, 11 U.S.C. §§ 1101 *et seq.,* consolidates features of Chapters X, XI and XII of the 1898 Act and with slightly different language retains the requirement that a Code Chapter 11 plan be proposed in good faith, one of the conditions of confirmation. 11 U.S.C. § 1129(a)(3). Chapter 13's good faith feature is dealt with, *infra.*

**21.** See 10 *Collier on Bankruptcy* (14th ed.) ¶ 29.06(6) for a discussion of some factors relevant to "good faith".

**22.** Compare Sections 366(2), 11 U.S.C. (1976 ed.) § 766(2) (Chapter XI), 472(2), 11 U.S.C. (1976 ed.) § 872(2) (Chapter XII) and 656(a)(2), 11 U.S.C. (1976 ed.) § 1056(a)(2) (Chapter XIII),

with Section 221(2), 11 U.S.C. § 621(2) (Chapter X). Chapter X retained the "fair and equitable" standard in Section 221(2) as explained by *Case v. Los Angeles Lumber Products Co., Ltd.,* 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110 (1939). The "best interests" standard was placed in Chapters XI, XII and XIII in 1952 as more "practicable" and "realistic" for those statutory schemes. See Sen.Rep.No.1395, 82d Cong., 2d Sess. 11 (1952).

**23.** This statute was not carried into Section 17(a) of the Act defining other non-dischargeable debts. This is not unusual. See, *e. g.,* Section 806(a)(1) of the Act of September 8, 1980, Pub.L.96–342, 94 Stat. 1095, by which Chapter 37 of 5 U.S.C. was amended by adding a Section 301b(d)(3) which exempted from a bankruptcy discharge the debts there described.

*New York State Higher Education Services Corp. v. Kohn*, 5 B.C.D. 419 (1979), decided by this writer, traces the history of the interrelationship of student loans and bankruptcy into the 1978 Code, 11 U.S.C. § 523(a)(8), after its enactment. The Court of Appeals for this Circuit in *In re Adamo et al.*, 2 Cir., 619 F.2d 216 (1980), apparently accepted the "detailed analysis" by this and two other bankruptcy courts of the travels of student loan legislation into the 1978 Code. 619 F.2d 219 at note 4. For purposes of this decision, however, it is enough to note at this juncture that the non-discharge of student loans is within the terms of 11 U.S.C. § 523(a)(8), a part of Chapter 5 of the 1978 Code. While the several sections of that chapter apply in a case filed under Chapter 13, 11 U.S.C. § 103(a), Congress treated the matter specially in Chapter 13 as will be seen. And the provisions of Chapter 13 apply "only in a case under such chapter". 11 U.S.C. § 103(h). Why and how Congress treated the matter of student loans in the context of a Chapter 13 case must now be met.

## II.

### A. *The Background of Enacted Chapter 13*

In 1970, Senate Joint Resolution 88 [24] established the Commission on the Bankruptcy Laws of the United States. At hearings conducted by that Commission relevant to the issue dealt with in this decision.

> "the Commission was frequently informed by witnesses at its hearings and in correspondence that the preponderant majority of debtors desire some means of

repaying their debts in preference to incurring the stigma and other consequences of bankruptcy." [25]

In considering this perspective, the Commission, mindful of the 1971 Brookings Report, *supra* note 16, stressed the urgent need for sweeping change, particularly in the realization of the rising tide of consumer insolvency.[26] In light of this fact, and as will be seen, the purpose of Code Chapter 13, among others, was to provide expanded flexible relief to a debtor in a fashion which would overcome the rigidity of Chapter XIII of the 1898 Act, an inadequacy which denied full relief and limited the fresh start which was felt essential to "modern bankruptcy law".[27]

Among other things, the narrow reach of Chapter XIII only to those described in Section 606(6), necessarily read with Section 606(8), 11 U.S.C. (1976 ed.) § 1006(6) and (8), was to be expanded. The matter of hardship discharge needed reworking from the mode of dealing with them afforded by Section 661 of Chapter XIII, 11 U.S.C. (1976 ed.) § 1061. The potential for unsecured creditor veto of a plan, no matter how generous the plan, Section 652(1), 11 U.S.C. (1976 ed.) § 1052(1), was seen as an evil which needed extirpation for this above all was pointed to as the factor underlying the failure of most Chapter XIII cases. It was the insistence upon creditor acceptance which made it necessary that debtors eschew compositions they could afford for extensions which they could not in terms of the life styles their wages necessitated. Senate Rep.No.95–989, 95th Cong., 2d Sess.

---

24. Pub.L.91–354, 91st Cong., 1st Sess. (1970).

25. Report of the Commission on the Bankruptcy Laws of the United States, H.R.Doc.No.137, Part I, 93d Cong., 1st Sess. 157 (1973). Hereafter this Report will be cited as Commission Report.

26. *Inter alia*, Congressman Rodino observed on the House floor that "nearly 90% of all bankruptcies in 1977 were consumer cases". 123 Cong.Rec.H 11697 (daily ed. October 27, 1977).

27. See House Report No.95–595, 95th Cong., 1st Sess. 117 (1977). This report is to an earlier version of H.R. 8200 than the version enacted. Enacted H.R. 8200 was offered on September 28, 1978 and as an amendment to Senate Amendments to the earlier version of H.R. 8200 and enacted on November 6, 1978 with changes made by the Senate and accepted by the House early in October, 1978. See 124 Cong.Rec.H. 11047 *et seq.* (daily ed. September 28, 1978) for the text of that version of H.R. 8200 and H 11089 *et seq.*, for the statement about it by Congressman Edwards. For an excursion through the legislative process culminating in enactment of H.R. 8200, see *1 Collier on Bankruptcy* (15th ed.) ¶ 1.03.

13 (1978), U.S.Code Cong. & Admin.News 1978, p. 5787.[28]

█ While "passing reference by a single legislator" is a slim reed upon which to rest a purpose not expressed in enacted legislation, *Leist, et al., v. Simplot, et al.,* 638 F.2d 283, 352 (2d Cir. 1980), (Mansfield, C. J., dissenting), thought out statements supporting what is enacted are more substantial reeds. And so, on the matter of the abolition of unsecured creditor consent to Code Chapter 13 plans, Congressman McClory's statement is useful for Congress heeded its thoughts.

> "We feel that if the debtor makes an effort to repay, his creditors should not be able to say that the plan does not propose to pay enough or it does not do other things the creditor wants."

123 Cong.Rec.H 11699 (daily ed. October 27, 1977). As a proponent of what was enacted, Congressman McClory's statement is entitled to weight as a reliable indication of Congress' purpose at least from the vantage point of the statement's focus. Compare *Bryant v. Yellen,* 447 U.S. 352, 376, 100 S.Ct. 2232, 2245, 65 L.Ed.2d 184 (1980).

These were some of the changes Congress perceived as absolutely necessary if new Chapter 13 were to be accepted by debtors as a valuable tool to relieve the oppression of financial instability. In short, the underlying theme of Code Chapter 13 was, from a debtor's vantage point, its flexibility to the end that each debtor had it in his own hands to tailor a plan to his own circumstances. House Report No.95–595, *supra,* at 124. That Congress achieved this broad purpose seems plain from the statistics of the Administrative Office of the United States Courts at the close of the first year of experience under the Code—October 1, 1979—September 30, 1980. Out of 158,000 personal bankruptcies, over 64,000 were filed under Chapter 13.

Chapter 13 is an effort by Congress to temper the rigidity which so inhibited the use of Chapter XIII. It is a carefully matured scheme and not a "makeshift patchwork", *Guessefeldt v. McGrath,* 342 U.S. 308, 319, 72 S.Ct. 338, 344, 96 L.Ed. 342 (1952). It is designed to achieve true and needed reform.

In pursuance of its laudable and enlightened aim, Congress wrote a complete, new debtor relief scheme with so many novel and far-reaching effects that the passions it has aroused have played a dominant part in limiting the reach of Chapter 13. Nowhere have these passions been plainer than in the plethora of judicial thought on the matter of the debtor's plan and what it achieves if confirmed by the court. This decision continues this "gradual process of judicial inclusion and exclusion". *Rosenberg v. Fleuti,* 374 U.S. 449, 462, 83 S.Ct. 1804, 1812, 10 L.Ed.2d 1000 (1963).

It is therefore time to explore what Congress wrote, why it wrote as it did, and how what it wrote works, for while courts may not end with the words Congress wrote, they certainly begin there. *F.T.C. v. Bunte Bros.,* 312 U.S. 349, 350, 61 S.Ct. 580, 581, 85 L.Ed. 881 (1941).

B. *The Operative Sections of Chapter 13*

At the outset, in 11 U.S.C. § 101(24), an "individual with regular income" otherwise eligible for Chapter 13 relief under the broadened eligibility requirements of 11 U.S.C. § 109(e) may fund his plan with regular and stable income from any source, not just his wages, as under Chapter XIII of the 1898 Act.[29] The debt ceilings of Section 109(e) tend to broaden the kinds of debtors for whom Congress wrote the chapter.

One of the most important of the sections of Chapter 3, *i. e.,* the automatic stay provisions of 11 U.S.C. § 362(a), serves to give

---

**28.** See also Commission Report, Part I at 160 (1973).

**29.** The only limitations for eligibility are that Chapter 13 is for individual debtors who may be sole proprietors of small businesses, employees for wages, retired people with regular and stable income and even welfare recipients as in *In re Iacovoni,* 2 B.R. 256, 1 C.B.C.2d (Bkrtcy.D. Utah 1980). There are aggregate debt limitations as described by Section 109(e). Individual stock and commodity brokers are barred from Chapter 13 relief, however.

the Chapter 13 debtor the breathing space needed for him to compose his plan.[30]

A unique and generous boon to the Chapter 13 debtor is 11 U.S.C. § 1301 which stays action by the debtor's creditors against those liable with him. This feature insulates the debtor from indirect pressure from his creditors and is designed to correct an evil found to exist under prior law whereby the debtor was forced to convert to a liquidating bankruptcy in order to reaffirm the debt and thereby protect his co-debtor, generally a relative or co-worker. House Report No. 95–595 at 118, 121, 146.

Only the debtor may file a plan. 11 U.S.C. § 1321.[31]

Congress' perception of the Chapter 13 debtor's plan is illuminating. Unlike Section 646(1) of the 1898 Act, 11 U.S.C. (1976 ed.) § 1046(1), which mandated that the Chapter XIII plan *had to* "include provisions dealing with unsecured debts generally, *upon any terms*;"[32] (emphasis added), 11 U.S.C. § 1322(a) makes no mention of either secured or unsecured creditors save those entitled to priority under 11 U.S.C. § 507. 11 U.S.C. § 1322(a)(2).[33] It is only in 11 U.S.C. § 1322(b)(1) that Congress permits rather than commands the debtor to provide for creditors, secured or unsecured. How a debtor decides to deal with creditors depends, then, on what part of his future earnings or regular income will be submitted to the trustee for the execution of the plan. And that Congress was aware that the living needs of a debtor would

control the proposals in a plan is clear from 11 U.S.C. § 1322(a)(1) permitting use of part of the debtor's income to consummate his plan. This is made crystal clear from these words in House Report 95–595 at 124, U.S.Code Cong. & Admin.News 1978, p. 6085.

"The court will necessarily be required to consider the debtor's ability to meet his primary obligation to support his dependents, because otherwise the plan is unlikely to succeed. Moreover, it may force the debtor or his dependents to become a public charge, to the detriment of the debtor, his dependents, his creditors, and the public. If the debtor is able to meet his obligations, both under the plan and to his dependents, the court confirms the plan."

Congress' enlightened generosity is further evidenced by the debtor's permissible treatment of his secured creditors. While home mortgage payments to the mortgagees cannot be modified, 11 U.S.C. § 1322(b)(2), prior defaults may be cured by the force of 11 U.S.C. § 1322(b)(5). Subsection (b)(3) addresses the curing of defaults other than those on home mortgages. This may result in larger mortgage payments but the debtor's home is protected. House Report No. 95–595 at 429.

Creditors secured by other property may be modified, *e. g.,* creditors secured by automobiles or purchase money security interests in household goods and furnishings used by the debtor or his dependents.[34]

---

**30.** The provisions of Chapter 3 apply in the Chapter 13 case. 11 U.S.C. § 103(a).

**31.** The Chapter 13 debtor, unlike the Chapter 7 or Chapter 11 debtor, cannot be involuntarily placed there. 11 U.S.C. § 303(a) authorizes an involuntary petition "only under chapter 7 or chapter 11" of the Code. In a Chapter 11, the debtor, whether an individual or otherwise, is given the exclusive right to file a plan within the period fixed by 11 U.S.C. § 1121(b) unless a Chapter 11 trustee has been appointed. 11 U.S.C. § 1121(c)(2).

**32.** This underlined clause in theory reinforced the definition of a plan carried in Section 606(7), 11 U.S.C. (1976 ed.) § 1006(7), that it meant "a composition or extension". As already seen, in practice the right of the debtor's

unsecured creditors to veto something less than suited them placed debtors into the position of offering an unrealistic extension of the total debt which sooner or later resulted in default.

**33.** And as to these priority creditors, the debtor is not required to pay their claims in full at confirmation under 11 U.S.C. § 1322(a)(2). Rather, such claims may be paid in installments over the life of the plan.

**34.** That the 1978 Code is a "carefully matured enactment" is plain from a reading of non-Chapter 13 sections in Chapter 5 which apply in the former by the force of 11 U.S.C. § 103(a). Apart from the sweep of the exemption provisions, 11 U.S.C. § 522(d), and the ability of a debtor, under 11 U.S.C. § 522(f), to avoid a lien

Given these sections, each designed in its own way to arrive at a delicate balance between the needs of debtors and their families and the legitimate rights of creditors, it should surprise no one that Congress eliminated any requirement that a debtor provide for his unsecured creditors at all and, where he does, to deny them the veto power over a plan which accommodates the needs of a debtor and his family for shelter and necessaries. After all, a budget calculated to keep a debtor's life and limb together and to provide for those creditors secured by home and hearth in order to preserve them to the debtor goes only as far as the available dollars take it. House Report 95–595 at 123–4. Congress plainly recognized "the diversity of the individuals involved" in Chapter 13. Sen.Report No. 95–989 at 12–13 discloses its findings as to why Chapter XIII was "basically and seriously defective", and how it hoped Code Chapter 13 would solve the problems of Chapter XIII.

"insofar as bankruptcy law can provide a simple yet precise and effective system for individuals to pay debts under bankruptcy court protection and supervision".

The conditions precedent to confirmation are found in 11 U.S.C. § 1325(a). Special provision is made for secured creditors who may vote to accept the plan and retain their lien but only to the extent the secured claim is allowable, i. e., to the value of the property. 11 U.S.C. § 1325(a)(5).

The unsecured creditors under 11 U.S.C. § 1325(a)(4) must receive under the plan not less than what they would receive if the debtor's estate were liquidated and the proceeds distributed at confirmation.[35] The House Report, No. 95–595, at 123–4, U.S.

Code Cong. & Admin.News 1978, pp. 6084–5, explains the reach of this "best interests" test in these words:

"The bill requires only that creditors receive under the plan more than they would if the debtor went into straight bankruptcy. Debtors will be able to make a more realistic appraisal of their finances, and will be able to propose a plan under which they can succeed. Creditors will not be disadvantaged, because the plan must still pay them more than they would get under a liquidation."

11 U.S.C. § 1325(a)(4) provides a more certain index than the "best interests" test of its predecessor, Section 656(a)(2) of Chapter XIII, 11 U.S.C. (1976 ed.) § 1056(a)(2). Apart from this test, Chapter 13 nowhere quantifies how a debtor should treat his unsecured creditors. It cannot be denied, however, that with the generous exemptions afforded by 11 U.S.C. § 522(d), and with the resultant withdrawal of that property from the assets of the debtor's estate available for creditors, most consumers in bankruptcy have "no asset" estates. Creditors in such liquidating bankruptcies therefore receive nothing. The Chapter 13 plan must offer creditors "not less" than this "nothing". 11 U.S.C. § 1325(a)(4) does not say the debtor's plan must offer something more than "nothing". The difficulties soon to be seen suggest themselves.

But 11 U.S.C. § 1325(a)(4), standing alone, is forthright on its face and Congress' purpose is surely clear. Two other sections of Chapter 13 must be considered for it is at the confluence of these tributaries of the Chapter 13 river that the myriad difficulties have surfaced.

---

impairing the exemption if it is a judicial lien, 11 U.S.C. § 522(f)(1), or a "nonpossessory, non-purchase-money security interest" in household goods, House Report No. 95–595, at 126–7, 362, 11 U.S.C. § 506 is a potent benefit to a debtor in his dialogue in his Chapter 13 plan with his creditors not secured by his home. Under that section, an allowed secured claim is such only to the extent of the value of the property and unsecured as to the deficiency, an enormous benefit to a debtor whose plan provides for payments to service the lien limited to

the value of the property. House Report 95–595 at 124.

**35.** The phrase "effective date of the plan" in 11 U.S.C. § 1325(a)(4) appears also as a confirmation standard in the Chapter 11 analogue—11 U.S.C. § 1129(a)(7). It is generally said that the "effective date of the plan" means the date the order of confirmation becomes final, binding the debtor to his promises. 5 *Collier on Bankruptcy* (15th ed.) ¶ 1325.01[2][D][b][i].

11 U.S.C. § 1325(a)(3) provides that as a prelude to confirmation, the debtor's plan must have been "proposed in good faith". Here also, standing alone, "good faith" presents few problems. If a debtor has confided a portion of his future income to his creditors and has not thereby stripped himself of all that makes life otherwise worth living, it cannot be said that his plan lacks the requisite good faith merely because his unsecured creditors are disgruntled by what the debtor's budget yields. And, as seen, Congress has fixed no minimum requirement for a debtor to sustain his burden of showing good faith.

Here the fault lies with Congress for nowhere does it insist that a debtor take into account the future enhancement of his prospects.[36] Neither does Congress insist that a debtor view his plan from the standpoint of a Cassandra. To be sure, 11 U.S.C. § 1329 does provide for post-confirmation modification up, 11 U.S.C. § 1329(a)(1), or down, 11 U.S.C. § 1329(a)(2). But the court has no reason to suppose that debtors will, under what is essentially a self-monitoring system, voluntarily seek to improve their creditors as their own fortunes change for the better. The downward alternative, the court cynically suspects, will be more availed of than the reverse. But even this second tributary, that of "good faith" read with the new "best interests" test of 11 U.S.C. § 1325(a)(4), does not create a rapid sufficient to overturn and sink the plans of these debtors, although much has already been written by bankruptcy judges on the quantum of a debtor's Chapter 13 plan and the application to such plans of the good faith test.[37]

The sticking point here, and in so many other cases, is what a confirmed plan means to the Chapter 13 debtor under the Code.[38]

The court therefore starts, as it must, with the reach of a debtor's discharge in a liquidating bankruptcy case.

Notwithstanding the grant of a discharge in a liquidating bankruptcy under Chapter 7 of the 1978 Code, 11 U.S.C. § 727,[39] certain debts described by 11 U.S.C. § 523(a) survive. The limited reach of a discharge has been a part of the fabric of bankruptcy for many years. Under the 1898 Act, the debts described by Section 17(a), 11 U.S.C. (1976 ed.) § 35(a), were outside the discharge granted under Section 14, 11 U.S.C. (1976 ed.) § 32.[40] As already seen, the survival of student loans from a bankruptcy discharge was fixed by another statute, 20 U.S.C. (1976 ed.) § 1087–3, discussed earlier.

And so matters stood until the 1978 Code took effect on October 1, 1979.

11 U.S.C. § 523(a) of the 1978 Code is the descendant of Section 17(a) of the 1898 Act. It reworks the provisions of the latter, House Report No. 95–595 at 363–5, and includes a student loan provision which reads as follows in 11 U.S.C. § 523(a)(8):

"A discharge under section 727, 1141 or 1328(b) of this title does not discharge an individual debtor from any debt . . . to a governmental unit, or a nonprofit institution of higher education, for an educational loan, unless—

(A) such loan first became due before five years before the date of the filing of the petition; or

(B) excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents;"

---

**36.** This court in *Matter of Kohn*, 5 B.C.D. 419 (1979), took the matter of future enhancement of a debtor's prospects into account in turning aside that debtor's claim that his student loan commitment should be nullified because of his then economic condition. This was a liquidation case, not a Chapter 13. The debtor sought a hardship discharge. 11 U.S.C. § 523(a)(8)(B).

**37.** See III A, *infra*, and the Appendix to this decision.

**38.** See III A, *infra*.

**39.** The provisions of Chapter 7 do not apply in a Chapter 13 case. So much is plain from 11 U.S.C. §§ 103(a) and (b).

**40.** There were procedural limitations on a creditor's rights to assert some of these. See Section 17(c)(2), 11 U.S.C. (1976 ed.) § 35(c)(2) and its procedural mate, Bankruptcy Rule 409(a)(2), 411 U.S. 1053, 93 S.Ct. 3135, 37 L.Ed.2d lix.

Among the debts also surviving discharge in a liquidating bankruptcy is that involving alimony and support. 11 U.S.C. § 523(a)(5).

But in writing Chapter 13 from the vantage point of discharge, Congress took an entirely different tack, different not only from a liquidating bankruptcy but from the effect of confirmation under the 1898 Act. Unlike Section 660 of the 1898 Act, 11 U.S.C. (1976 ed.) § 1060, which permitted the non-dischargeable debts described by Section 17(a) to survive as to creditors who had not accepted the debtor's plan,[41] 11 U.S.C. § 1328(a) of the 1978 Code provides for the debtor's discharge upon completion of all the payments under the plan save for two kinds of debts which survive. 11 U.S.C. § 1328(a) reads as follows:

> "As soon as practicable after completion by the debtor of all payments under the plan, unless the court approves a written waiver of discharge executed by the debtor after the order for relief under this chapter, the court shall grant the debtor a discharge of all debts provided for by the plan or disallowed under section 502 of this title, except any debt—
>
> (1) provided for under section 1322(b)(5) of this title; or
>
> (2) of the kind specified in section 523(a)(5) of this title.

The first of these surviving debts involves obligations, secured or unsecured, on which the last payment is due after payments under the debtor's plan have been completed. House Report No. 95–595 at 430. The other surviving debt is the alimony-support obligation excepted from discharge by 11 U.S.C. § 523(a)(5).[42] Obliga-

tions such as those in 11 U.S.C. § 523(a)(5) have long been the subject of concern by both the national legislature and state legislative bodies. See *Wetmore v. Markoe*, 196 U.S. 68, 25 S.Ct. 172, 49 L.Ed. 390.

Save for this, the Chapter 13 discharge eliminates the debts not discharged under Section 17(a) of the 1898 Act nor under 11 U.S.C. § 523(a) of the Code in a bankruptcy liquidation. It cannot be denied that the reach of the Chapter 13 discharge scheme thus excuses many debts which, under 11 U.S.C. § 523(a), survive because based on some species of debtor misconduct more egregious than a default on a student loan obligation. Thus, debts grounded on fraud, 11 U.S.C. § 523(a)(2), on fiduciary fraud, embezzlement and/or larceny, 11 U.S.C. § 523(a)(4), willful and malicious injury to person or property, 11 U.S.C. § 523(a)(6), and fines and penalties, 11 U.S.C. § 523(a)(7), will be discharged in a successful Chapter 13 but not in a liquidating bankruptcy.

But by singling out one of the 11 U.S.C. § 523(a) non-dischargeable debts, *i. e.*, alimony and child support, and by making special provisions for priority claims under 11 U.S.C. § 507(a), Congress went so far and no further in forging a reformed, flexible Chapter 13.[43] Moreover, in coming to the conclusion that exceptions from the Chapter 13 discharge should be as narrow and specific as enacted 11 U.S.C. § 1328(a) makes them, Congress had ample occasion to consider its policy decision. This was no inadvertence caused by intense involvement in the creation of an entire statute as in *In re Adamo et al.*, 619 F.2d 216 (2d Cir. 1980).

---

**41.** Section 660 dealt with a completed plan. Section 661, 11 U.S.C. (1976 ed.) § 1061, authorized a hardship discharge but limited in scope in line with Section 660.

**42.** Sen. Report No. 95–989 at 142–3 speaks to survival of debts arising from injury to property, a debt excepted by 11 U.S.C. § 523(a)(6), but not to alimony or support. The Senate Committee might mistaken the listing of non-dischargeable debts in its own version of bankruptcy reform. S.2266, 95th Cong., 2d Sess. Cal. No. 1026 (1978), carries alimony and child support provisions in Section 523(a)(6) and

debts based on willful and malicious injury in that bill's Section 523(a)(5). An earlier House bill, H.R. 7330, 95th Cong., 1st Sess. (1977), carried Section 523(a) in the order in which it was enacted in H.R. 8200.

**43.** Fresh taxes are given a sixth priority by 11 U.S.C. § 507(a). Such taxes survive a bankruptcy discharge under 11 U.S.C. § 523(a)(1). 11 U.S.C. § 1322(a)(2) requires payment of these and other priorities in full but on a deferred payment schedule rather than, as before, by payment in full as a condition precedent to confirmation of a Chapter XIII plan.

The court paraphrases, in the context of this dispute, the felicitous phrasing of Mr. Justice Jackson in *Wong Yang Sung v. McGrath*, 339 U.S. 33, 40–41, 70 S.Ct. 445, 449–450, 94 L.Ed. 616 (1950), that Chapter 13

> "represents a long period of study and strife; it settles long-continued and hard-fought contentions, and enacts a formula upon which opposing social and political forces have come to rest. It contains many compromises and generalities and no doubt some ambiguities. Experience may reveal defects." [44]

The 1973 bill proposed by the Commission to study the bankruptcy law [45] would have discharged some debts on completion of the debtor's payments under the plan. Section 6–207(a)(1) of that bill, optimistically called the Bankruptcy Act of 1973,[46] Section 6–207(a)(2)(A), authorized a hardship discharge. But Section 6–207(b) gave like effect to a completed performance discharge and to a hardship discharge. In both, the discharge "extinguishes all liability . . . on claims provided for in the plan",[47] but excepted from discharge in both instances were long term debts (Section 6–201(4)) and the full sweep of the non-dischargeable debts set out in Section 4–506(a).[48]

When Congress turned its own attention to the notion of bankruptcy reform, it was well aware and intimately familiar with the Commission's work. See House Report No. 95–595 at 1, 3; Senate Report No. 95–989 at 1–2. While the Commission's bill was introduced as H.R. 10792 in 1973 at the first session of the 93d Congress,[49] in the next Congress, the 94th, this bill was reintroduced as H.R. 31, 1st Sess. (1975).[50] The relevant provisions on dischargeable debts and confirmation of debtor plans in Chapter 13 (there carried as Chapter VI), were unchanged from the Commission bill.

The bankruptcy judges' bill, H.R. 32, in its provision dealing with the effect of confirmation on discharge, Section 6–501(b), at least facially, would have discharged all debts in a completed plan but would have retained nondischargeable debts in an uncompleted plan.

S. 236, 94th Cong., 1st Sess. (1975), followed the Commission bill and H.R. 31 insofar as the effect of confirmation on dischargeable debts.

H.R. 6 was introduced at the first session of the 95th Congress on January 4, 1977. Section 523(a) of that bill did not except student loans from discharge and excepted from discharge in a completed Chapter 13 only long-term debts. Where discharge was given to Chapter 13 debtors who could not complete their plans, long-term debts and non-dischargeable debts described by Section 523(a) survived.

The version of H.R. 8200, introduced in the same Congress, also included student loans in the discharge. But it limited the discharge of a completed Chapter 13 by excepting long-term debts and alimony and child support debts under Section 523(a)(5).

S. 2266, also introduced in 1977 at the first session of the 95th Congress, included

44. See III A, *infra*, for the experiences in Chapter 13.

45. See note 25, *supra*.

46. Commission Report, Part II at p. i (1973).

47. The hardship discharge released only unsecured claims provided for in the plan.

48. Section 4–506(a) of the Commission bill described ten debts which were not within the discharge provided for by Section 4–505. Unpaid student loans were included in Section 4–506(a)(8). The inclusion of educational loans was the Commission's response

> "to the rising incidence of consumer bankruptcies of former students motivated primarily to avoid payment of educational loan debts".

The Commission anticipated increased incidence. See Commission Note to Section 4–506(a) in Part II of its Report at 140.

49. The National Conference of Bankruptcy Judges drafted an alternative measure. This was introduced at the second session of the 93d Congress as H.R. 16643. See House Report No. 95–595, at 2. This bill was reintroduced in the next Congress as H.R. 32, 94th Cong., 1st Sess. (1975).

50. Meantime, and side by side, the Senate introduced its own bills. See Sen. Report No. 95–989 at 2.

student loans among the debts surviving discharge. Section 523(a)(8). But only alimony and long-term debt survived the discharge for the successful Chapter 13 plan.[51]

The February, 1978 version of H.R. 8200[52] in its Section 523(a)(8) included educational loans as nondischargeable debts but limited the Chapter 13 discharge to long-term debts and alimony and child support.

From all this, the conclusion is irresistible that Congress wrote as it did with full knowledge of the import of non-dischargeable debts in a liquidation, and of what Chapter 13 should be from the standpoint of the debtor's fresh start. As a matter of policy Congress did not see fit to grant special dispensation to student loans where a debtor had completed the terms of his plan. From the broad range of debts otherwise surviving discharge, only alimony survives. This was no inadvertence, for Congress, in Chapter 13, may be said to have truly served

"as the index for Lord Acton's comment that the treatment of the unfortunate is the critical test for any social order."[53]

The presumption that Congress deliberately eschewed special tenderness for student loans

"is strongest when Congress has enacted a comprehensive legislative scheme",

fully integrated, as is Chapter 13. *Northwest Airlines, Inc. v. Transport Workers Union of America,* — U.S. —, 101 S.Ct. 1571 at 1584, 69 L.Ed.2d 750 at 767 (1981). In short, this "breadth of coverage was vital to its mission". *Powell v. U. S. Cartridge Co.,* 339 U.S. 497, 516, 70 S.Ct. 755, 765, 94 L.Ed. 1017 (1950).

Given the words Congress wrote so plainly, there can be no merit to any view which holds that student loans should be read into the reach of the 11 U.S.C. § 1328(a) Chapter 13 discharge. The section is plain and means what it says. There is simply nothing in the section to construe for that task

"is fundamentally different from the authority to fashion a new rule or to provide a new remedy which Congress has decided not to adopt."

*Northwest Airlines, Inc. v. Transport Workers Union of America, supra.*[54]

It is because 11 U.S.C. § 1328(a) is so clearly drawn that many of our best intentioned, knowledgeable bankruptcy judges have tried to fashion some approach by which student borrowers who have thereby gleaned from our society all that it has to offer will be brought to book. See III A, *infra.*

The method to achieve this end has been found in 11 U.S.C. § 1325(a)(3)'s requirement that a condition of confirmation is that "the plan was proposed in good faith ..." *Not the Chapter 13 petition but the plan offered by the debtor.* This requirement has been a constant since Section 6–204(b) of the Commission bill in 1973, remaining unchanged through the unfolding of the legislative process which led to the 1978 bankruptcy reform legislation. Indeed, as seen, that condition pervaded Chapters XI, XII and XIII of the 1898 Act but experience there left Congress with little judicial gloss and in the Code the national legislature provided none.

---

51. An intervening House bill, H.R. 7330, 95th Cong., 1st Sess. (May, 1977), did not except student loans in its Section 523(a) and in the successful Chapter 13 plan, only long-term debts survived.

52. 95th Cong., 2d Session.

53. Dunne, *Hugo Black and the Judicial Revolution.* Simon & Schuster, New York (1977) at 97.

54. To be sure, it is anomalous that where a Chapter 13 debtor fails to complete his plan, and secures a hardship discharge under 11 U.S.C. § 1328(b), all the non-dischargeable

debts described by 11 U.S.C. § 523(a) remain and are not extinguished. Conceivably, a debtor who offered his creditors more in his plan and paid more before failing to complete, will secure a hardship discharge which leaves his Section 523(a) debts intact while the debtor who offered less and completed his plan secures the broad 11 U.S.C. § 1328(a) discharge. If Congress may be said to have misconceived its mission to afford a fresh start, 11 U.S.C. § 1328(c) may be said to be the place. But that section is plain. It refers only to the hardship discharge of 11 U.S.C. § 1328(b).

How this "good faith" requirement of the debtor's plan has been applied in a contrariety of judicial thought which, to say the least, has undermined the predictability which debtors should have before seeking a fresh start in bankruptcy must now be examined.

### III.

#### A. *The Response of the Judiciary*

However seriously judges take their roles in the judicial process, they bring only themselves to the task. Who we are, what we are, where we are and where we came from can rarely be divorced from the judicial task. In short, we see only through our own eyes. So

> "[I]t is true also of journeys in the law that the place you reach depends on the direction you are taking. And so, where one comes out on a case depends on where one goes in."

*United States v. Rabinowitz*, 339 U.S. 56, 69, 70 S.Ct. 430, 436, 94 L.Ed. 653 (1950), Frankfurter, *J.*, dissenting.

Legitimately frustrated, indeed outraged, by what Congress achieved insofar as the reach of the Chapter 13 discharge, many of us have yielded to what Mr. Justice Holmes called the "hydraulic pressure" [55] as cases such as this appeal to our feelings and therefore have the tendency to "distort our judgment".[56]

█ The scheme of Chapter 13 must be revisited for a moment in order to focus on our discomfiture with the bonanza discharge given to the successful debtor and the routes travelled to seize on something to relieve our feelings. A Chapter 13 plan need make no provision to pay unsecured creditors anything. Provision for unsecured creditors is *not* mandated by 11 U.S.C. § 1322(a). To be sure, a Chapter 13 which proposes to pay nothing to any creditor, secured or unsecured, is contrary to the spirit of the chapter which insists that all or a portion of a debtor's future earnings or other future income be submitted for distribution under a plan. 11 U.S.C. § 1322(a)(1). Therefore, a total non-payment plan is denounced and cannot comply with Chapter 13 and cannot be confirmed. 11 U.S.C. § 1325(a)(1). 11 U.S.C. § 101(24) defining an individual with regular income reinforces this view for it contemplates use of such income "to make payments under a plan under Chapter 13". Thus, a debtor could use all of his available income to deal with his home mortgagee and other secured creditors, have nothing left for unsecured creditors and still be in good faith.

Not only did Congress eliminate any insistence that unsecured creditors be treated, but where a debtor does, such creditors are denied the opportunity they once had to veto a plan which affords them too little as they see it. All Congress assured unsecured creditors with whom a debtor chooses to treat is that they receive not less than they would receive in a liquidation. 11 U.S.C. § 1325(a)(4). In view of the generous exemptions given debtors by 11 U.S.C. § 522(d), virtually any offer to unsecured creditors satisfies this test. And, of course, a successful plan achieves the bonanza discharge.

Nowhere in the words Congress wrote in Chapter 13 is there any mention of a minimum amount which has to be offered to unsecured creditors.[57]

Nowhere does Congress insist that a Chapter 13 debtor pay a higher minimum price for a Chapter 13 discharge merely because some or all of his unsecured creditors hold debts which might survive a Chap-

---

**55.** *Northern Securities Co. v. United States,* 193 U.S. 197, 400, 24 S.Ct. 436, 486, 48 L.Ed. 679 (1904), Holmes, *J.,* dissenting.

**56.** *Fedorenko v. United States,* 449 U.S. 490, 101 S.Ct. 737, 66 L.Ed.2d 686 (1981), Stevens, *J.,* dissenting.

**57.** 11 U.S.C. § 727(a)(9) of subchapter II of Chapter 7 of the Code, inapplicable to Chapter 13 cases, 11 U.S.C. § 103(b), is the only section which mentions a percentage in connection with a Chapter 13. But that section is addressed to the erstwhile Chapter 13 (or Chapter XIII) debtor given a discharge in that chapter and returns to the bankruptcy court as a Chapter 7 debtor.

ter 7 liquidating bankruptcy under 11 U.S.C § 523(a).

Yet, so many of us, uncomfortable with what Congress did, have tried to fashion some equitable rationale to defeat plans offering nothing or minimal amounts to unsecured creditors. Some of us have defeated plans regardless of how amply the debtor's plight has forced him to treat his mortgagee and/or other secured creditors.[58] And the "good faith" of the plan was and continues to be the vehicle. But this only serves to emphasize that the judicial process in this dispute is to construe a statute, not to determine equities, "processes which unfortunately do not necessarily lead to the same result". *Matter of Borgenicht*, 479 F.2d 150, 153 (2d Cir. 1973).

We have gone so far as to place a value on a debt which would survive a bankruptcy but not a Chapter 13 in order to justify a finding that a plan which offers less than the value of the debt is not within the "best interests" test now explained by 11 U.S.C. § 1325(a)(4). But such a holding cuts against the grain of the law that, save in a Chapter 13 plan, a debtor's after-acquired wages may not be reached unless a debt survives discharge. And in a Chapter 13, only alimony, as an 11 U.S.C. § 523(a) creature, survives. See *Matter of Turpin*, 644 F.2d 472 (5th Cir. 1981).[59]

It would seem that the "good faith" of a plan test may not be resorted to in the absence of clear Congressional purpose that this be looked to in order to arrive at some satisfactory quantitative value in a debtor's plan.

One conclusion emerging plainly is "that the legislative history does not permit a definitive answer". *Maine v. Thiboutot*, 448 U.S. 1, 7, 100 S.Ct. 2502, 2505, 65 L.Ed.2d 555 (1980). The most that can be said for the legislative history is that it contains nothing to require bankruptcy judges to reject the construction which the entire statutory scheme requires. *Ullman v. United States*, 350 U.S. 422, 433, 76 S.Ct. 497, 503, 100 L.Ed. 511 (1956).

As seen, the Commission was satisfied that relief provisions for debtors with regular income be liberalized to foster utility.[60] To achieve this, the Commission proposed that unsecured creditors be denied the right they had under Chapter XIII to vote on debtor plans and thus be in a position to veto a plan which did not offer enough.[61] The Commission felt that this creditor veto potential fostered unrealistic repayment plans.

To be sure, Senate Report No. 95–989 at 13 U.S.Code Cong. & Admin.News 1978 at 5799, does note that as under Chapter XIII, "100 percent payment plans will be encouraged" and that it was "also necessary to prevent Chapter 13 plans from turning into mere offers of composition plans . . .". But the Senate, on the very same page, also envisions "new Chapter 13" to permit "almost any individual with regular income to propose . . . a reasonable plan for debt repayment *based on that individual's exact circumstances*". (emphasis added).[62]

The House, on the other hand, saw new Chapter 13 as a valuable tool affording various debtors in various stages of economic disadvantage a real opportunity to perform promises which were realistic in terms of their plight. House Report No. 95–595 at 118 U.S.Code Cong. & Admin.News 1978, at 6079, saw Chapter 13, in these words:

"The purpose of Chapter 13 is to enable an individual, under court supervision and

---

**58.** Some judges have swallowed their personal feelings and have applied the scheme of Chapter 13 in accordance with the sections Congress wrote. An Appendix of Decisions reflecting the range of judicial thought is annexed.

**59.** *In re Jenkins*, 4 B.R. 278, 2 C.B.C.2d 129 (Bkrtcy.Colo.1980), *In re Yee*, 7 B.R. 747, 3 C.B.C.2d 388 (Bkrtcy.E.D.N.Y. 1980), and *In re Marlow*, 3 B.R. 305, 6 B.C.D. 77 (Bkrtcy.N.D.Ill. 1980), are in accord on this point.

**60.** Commission Report, Part II at 201.

**61.** Commission Report, Part I at 159.

**62.** The Senate's focus on a 100% plan may have been based on the experience of Chapter XIII where because of the vote of unsecured creditors, such plans were extracted from debtors who could ill afford them. See p. 15, *supra*.

protection, to develop and perform under a plan for the repayment of his debts over an extended period. In some cases the plan will call for full repayment. In others, it may offer creditors a percentage of their claims in full settlement."

There is, thus, at best, the realization in the legislative history that a 100% plan to unsecured creditors would be called for in appropriate cases. At worst, the legislative history, in isolated references, expresses the hope that debtors left on their own would choose to pay, if not in full, at least a substantial portion of their debts.[63]

■ Moreover, in light of the extensive legislative proceedings leading to enactment and Congress' awareness of the groundwork for reform laid by the Bankruptcy Commission, it must be assumed that the ultimate product was the result of policy considerations which Congress found compelling. And there can be little doubt that enacted Chapter 13 was the result of Congressional appraisal of, among other things, the facts found by the Commission concerning the experiences in Chapter XIII and the reasons for those experiences.[64] It must necessarily be assumed, as well, that in passing Chapter 13, Congress was aware of the previous statutes on the subject. *Erlenbaugh v. United States*, 409 U.S. 239, 243-4, 93 S.Ct. 477, 480, 34 L.Ed.2d 446 (1972).

It follows from all this that the content the judges have given to the phrase "good faith" finds no support in the scheme of Chapter 13, nor in its language, nor in its legislative history. There is utterly no basis for judges to read some kind of percent-age of debt figure for unsecured creditors into Chapter 13 where Congress did not do so, and to find want of good faith in order to defeat a plan because of private notions of what is right or wrong or what should or should not be.

The Senate certainly knew why Chapter XIII had not worked. Apart from "the diversity of the individuals involved" and recognition of the problems which cause "financial distress to begin with", Senate Report 95–989 at 12, it was "erratically applied" causing "the bankruptcy bench and bar in each judicial district to carefully measure . . . Chapter XIII based upon local practices and circumstances." *Ibid* at 13 U.S.Code Cong. & Admin.News 1978, at 5799. The Senate perceived new Chapter 13 as solving the problems of Chapter XIII "insofar as bankruptcy law can provide a simple yet precise and effective system." *Ibid* at 13, U.S.Code Cong. & Admin.News 1978, at 5799.

However people may agree or disagree that enacted Chapter 13 achieved this end, this court does not believe that the contours of enacted Chapter 13, given its purpose and its scheme, leave judges at large.

"We may not draw on our merely personal and private notions and disregard the limits that bind judges in their judicial function".

*Rochin v. California*, 342 U.S. 165, 170, 72 S.Ct. 205, 208, 96 L.Ed. 183 (1952).[65]

Let it not for a moment be thought that this court is any more comfortable with these cases than my esteemed colleagues who have labored to do the "right" thing in the context of defaulting students who, it

---

**63.** See statement by Congressman Edwards to this effect in 123 Cong.Rec.H 11699 (daily ed. October 27, 1977). But even the contemporaneous remarks of the sponsor of a bill, which Congressman Edwards was, will not control in analyzing the history of what Congress in fact wrote so differently from the thoughts expressed by that legislator. See *Consumer Products Safety Commission v. GTE Sylvania Co.*, 447 U.S. 102, 118, 100 S.Ct. 2051, 2061, 64 L.Ed.2d 766 (1980). Moreover, even if Congress misread the signs or was overly optimistic that things would eventuate as Congress hoped they would when it wrote Chapter 13 as

it did, judges cannot remedy the miscalculation. *Maryland Casualty Co. v. Cushing*, 347 U.S. 409, 437, 74 S.Ct. 608, 622, 98 L.Ed. 806 (1954), Black, *J.*, dissenting.

**64.** See Commission Report, Part I, Ch. 6, at 157–167.

**65.** Private notions are a luxury denied the judiciary but granted commentators. See *Good Faith and Confirmation of Chapter 13 Composition Plans: Analysis and a Proposal*, 65 Minn. L.R. 658 (1981).

seems, have hardly given themselves a chance to reap the harvest handed them. Most notably, the court refers to Bankruptcy Judge Goetz who authored *In re Yee*, 7 B.R. 747, 3 C.B.C.2d 388 (Bkrtcy.E.D.N.Y. 1980), and Bankruptcy Judge Krechevsky who authored *In re Murallo*, 4 B.R. 666, 6 B.C.D. 478 (Bkrtcy.D.Conn.1980).

> "It is not easy to stand aloof and allow want of wisdom to prevail, to disregard one's own strongly held view of what is wise in the conduct of affairs. But it is not the business of this Court to pronounce policy. It must observe a fastidious regard for limitations on its own power, and this precludes the Court's giving effect to its own notions of what is wise or politic. That self-restraint is of the essence in the observance of the judicial oath, for the Constitution has not authorized the judges to sit in judgment on the wisdom of what Congress and the Executive Branch do."

*Trop v. Dulles*, 356 U.S. 86, 120, 78 S.Ct. 590, 608, 2 L.Ed.2d 630 (1958), Frankfurter, J., dissenting.

And after all, this dispute calls for exercise in statutory construction which means that courts construe statutes. They do not construct them. That is for Congress. *Rosenberg v. Fleuti*, 374 U.S. 449, 463, 83 S.Ct. 1804, 1812, 10 L.Ed.2d 1000 (1963), Clark, J., dissenting; *United States v. Butler*, 297 U.S. 1, 56 S.Ct. 312, 80 L.Ed. 477 (1936).

And Congress is indeed setting out to review Chapter 13. As will be seen, however, in now taking remedial steps, Congress points up that it meant what it said when it cast Chapter 13 as it did scarcely three years ago. It might well be that in its review of the operation of Chapter 13, Congress will conclude that it erred or that it was unwise to do what it did, or simply that it was not careful enough. But this court will not rewrite Congress' words merely because it feels that Congress did not fully think out the relationship among the several sections. *Maine v. Thiboutot*, 448 U.S. 1, 8, 100 S.Ct. 2502, 2506, 65 L.Ed.2d 555 (1980).

**B.  *Congress Revisits Chapter 13***

**1.  *S.658, 96th Cong., 2d Session***

and

*S.863, 97th Cong., 1st Session*

In those hectic final days of September, 1978 and early ones of October, as Congress rushed to passage of bankruptcy reform legislation, more attention was necessarily paid to the compromise and adjustment of substantive differences than to errors in "spelling, punctuation, grammar, syntax" and the like. This was acknowledged by House Report No. 96–1195, 96th Cong., 2d Sess. 1 (1980), accompanying S.658, a bill "to correct technical errors, clarify and make minor substantive changes to Public Law 95–598" (the 1978 enacted statute). *Ibid* at 1.[66]

In connection with the "minor substantive changes" aspect of S.658, the House Judiciary Committee, reporting in House Report No. 96–1195, noted that the last minute changes resulted in the enactment of "incongruent provisions."

But, this Report goes on at p. 2:

" . . . there are several items of a substantive nature which are included because: (1) it was intended that the particular subject was to be dealt with at the earliest possible time after the enactment of the Bankruptcy Reform Act in connection with whatever technical amendments would be considered; (2) further conforming changes were found to be necessary to complete the legislative work intended by the Bankruptcy Reform Act; (3) the treatment of a subject in the Bankruptcy Reform Act was found to be incomplete; or (4) there was overlooked some minor yet relevant matter. In each case the change proposed is consistent with policies adopted by Congress in its enactment of the Bankruptcy Reform Act."

---

**66.** S.658 was proposed on September 7, 1979 even before the 1978 Code took effect three weeks later. 125 Cong.Rec. S.12178 (daily ed. September 7, 1979).

In keeping with this purpose of more than just minor substantive change,[67] and for purposes of the issue raised in these cases, Section 128(b) of S.658 gives gloss to enacted 11 U.S.C. § 1325(a)(3) by clarifying that the character of a Chapter 13 debtor's performance in his plan is that payments will be consistent with the debtor's ability, taking into account "monthly budgeted personal and family needs". House Report No. 96–1195 at 24. As the proposed amendment was cast by the House in its view of S.658, and as passed only by that chamber in December, 1980, amended 11 U.S.C. § 1325(a)(3) would permit confirmation, if, *inter alia,*

> "(3) the plan has been proposed in good faith ... *and represents the debtor's good faith effort.*"

(Italicized portion is the House amendment).

House Report No. 96–1195 at 24–26 goes to great length in explaining the reach of this change and need not be repeated here. It is enough to observe that the "good faith effort" of the House version of 11 U.S.C. § 1322(a)(3) is measured by the debtor's ability to make his payments. And the House makes clear that "good faith effort" is significantly different then the requirement that the plan be proposed in good faith.

> "The 'good faith effort' test incorporates as a separate prerequisite to the confirmation of a chapter 13 plan the requirement that the aggregate payments proposed under the plan represent a good faith effort on the part of the debtor to

satisfy the claims of creditors during the pendency of the plan consistent with the ability of the debtor to make payments under a chapter 13 plan. In short, the 'good faith effort' test looks to the present and future ability of the debtor to make payments into the chapter 13 creditors' fund during the course of the plan, while the traditional 'good faith' test examines the intentions of the debtor and the legal effect of the confirmation of a chapter 13 plan in light of the spirit and purposes of chapter 13."

*Ibid* at 24–5.

And the House Judiciary Committee repudiates the view that the section prescribes or authorizes the imposition by a court of any requirement that a Chapter 13 plan propose "any arbitrary minimum percentage or amount". Indeed, the House saw its amendment as a supplement to enacted 11 U.S.C. § 1325(a)(6) to the end that the debtor's payment be made "without undue hardship, with due regard for the *primary* duty of the debtor" to provide reasonable future support and maintenance to his family. *Ibid* at 25. Having thus explained its view of "good faith effort", the House Judiciary Committee envisions that:

> "the circumstances of a given case may require that the court confirm a chapter 13 plan which proposes no dividend whatever to holders of allowed unsecured claims".

*Ibid* at 25.[68]

In its version of S.658, the Senate saw "good faith effort" differently. As pro-

---

**67.** It should be clear just from the amendments to Chapter 13 here dealt with that they are not merely additions conforming to the "intent" of the enacted legislation, but rather substantive changes. Senator DeConcini, the Senate manager of the enacted Code, makes this quite plain.

"I must be candid, however, and point out that although this bill as originally introduced was referred to as the bankruptcy technical amendments bill, *the bill before us also contains some provisions that go beyond the definition of technical and are substantive.* The reason for this is primarily the result of our having had the benefit of 14 months of experience under the new Code—it was effective on October 1,

1979—and the knowledge that came with that experience which dictated that some substantive changes to the law were required to maintain fair and orderly bankruptcy administration".

Cong.Rec. S.15173 (daily ed. December 1, 1980).

**68.** Congressman Hyde's statements in support of the House amendment to S.658 on September 22, 1980, 126 Cong.Rec. H.9305, are ambivalent in that he agrees that good faith effort requires that bankruptcy judges consider all factors relating to the debtor's ability to pay including "his salary level, the nature of his debts ...". As to the latter, this Congressman goes on to explain that another S.658 amend-

posed, 125 Cong.Rec. S.12178 (daily ed. September 7, 1979), S.658 would have amended 11 U.S.C. § 1325(a)(3), by requiring that the plan be "the debtor's best effort". In view of the House change to a "debtor's good faith effort", *supra*, the Senate withdrew its proposed amendment to 11 U.S.C. § 1325(a)(3), and added to 11 U.S.C. § 1325(a)(4), the best interests of creditors test, the clause

> "and such plan represents the debtor's bona fide effort".[69]

In the matter of limitations on the reach of a discharge to the successful Chapter 13 debtor, both chambers of the national legislature agreed that something had to be done.

S.658, as proposed by the Senate, would have taken outside the discharge all debts enumerated by 11 U.S.C. § 523(a) as surviving discharge in a liquidating bankruptcy. Section 130. As amended by the House and passed by that chamber, 11 U.S.C. § 1328(a)(2) would have included student loans with alimony and child support as survivors of a Chapter 13 discharge.[70]

In S.863 replacing S.658, the Senate adheres to its view that virtually all debts not discharged in a liquidation survive the Chapter 13 process as well.

None of these proposed bills have been enacted, which may or may not make it more hazardous to elaborate on the views there expressed in order to infer the intent of the Congress which enacted the 1978 Code. *United States v. Philadelphia National Bank*, 374 U.S. 321, 348–9, 83 S.Ct. 1715, 1733, 10 L.Ed.2d 915 (1963).

But later actions may not be totally ignored particularly where, as here, virtually the same Congress undertook review of its handiwork even before it became effective. S.658 was introduced in September, 1979, note 66, *supra*. Congressman Edwards and Senator DeConcini were as much involved as before. And the experiences of the succeeding year were invited to assist the amending Congress to resolve the "largely imponderable elements of conflicting values", and the "assessment of their competing worth", as Mr. Justice Frankfurter saw the legislative process in *American Federation of Labor v. American Sash & Door Co.*,

---

ment would no longer discharge student loans. It is in this context that the above quotation must be read. This isolated reference to the "nature" of a debtor's obligations and the reference to the omission of student loans from enacted 11 U.S.C. § 1328(a) as an "oversight" cannot override the careful scheme of the enacted statute. *Chrysler Corporation v. Brown*, 441 U.S. 281, 311, 99 S.Ct. 1705, 1722, 60 L.Ed.2d 208 (1979). That the Chapter 13 enacted discharge provision was designedly broad is too well supported by Congress' actions to be overborne by this single reference to the nature of the debt or that student loans were intended to be excluded from the discharge.

**69.** After the House passed S.658 with its own changes, the Senate introduced S.863 in April, 1981 in the first session of the 97th Congress. Section 128(b) of S.863 achieves the "bona fide effort" test in proposed 11 U.S.C. § 1325(a)(4). The Senate sees its test as not necessarily requiring a significant percentage of a debtor's unsecured debts to be paid. See 126 Cong.Rec. S.15175 (daily ed. December 1, 1980). And the Senate refrains from suggesting any floor on repayment.

Senator DeConcini apparently saw "good faith" as had the House. He agreed that Congress did not intend in enacted 11 U.S.C. § 1325(a)(3) that courts should construe "good faith" in terms of the level of the debtor's payments, and that "no arbitrary repayment levels should be required by judges" or Chapter 13 trustees. 126 Cong.Rec. S.15175 (daily ed. December 1, 1980).

Save for the placement in 11 U.S.C. § 1325(a), and the tongue used, there seems little difference between the House's "good faith effort" and the Senate's "bona fide effort".

**70.** While the House's rewriting of S.658's Section 130 refers to the insertion of Sections 523(a)(6) and 523(a)(9) after Section 523(a)(5), the only real change was the inclusion of student loans. This is so because S.658 in Section 39 separates "child and spousal support" into two paragraphs, thereby necessitating renumbering of student loans from enacted 11 U.S.C. § 523(a)(8) to proposed Section 523(a)(9). House Report No. 96–1195 at 15. This explains the House Judiciary Committee's explanation of its view of Section 130 of S.658. House Report No. 96–1195 at 26. The House amendment does make the conforming change occasioned by the Senate's proposed renumbering of 11 U.S.C. § 523(a). A semi-colon and the conjunctive "and" follow and then an entirely new thought as to the new addition of student loans to non-dischargeable Chapter 13 debts.

335 U.S. 538, 557, 69 S.Ct. 258, 267, 93 L.Ed. 222 (1948).

These later bills therefore cannot be ignored and in light of what is now to be seen, recourse to their content is an aid in evaluating what Congress did enact not to override what was done, and is therefore a less hazardous exercise. *Erlenbaugh v. United States*, 409 U.S. 239, 243–4, 93 S.Ct. 477, 480, 34 L.Ed.2d 446 (1972).[71]

2. *The Work of the Subcommittee on Civil and Constitutional Rights of the House Judiciary Committee*

On June 30, 1980, a letter from Congressman Edwards as Chairman of the House Judiciary Committee's Subcommittee on Civil and Constitutional Rights was sent to, among other people, all bankruptcy judges, all United States Trustees, and Chapter 13 standing trustees.[72] This letter was in keeping with the subcommittee's responsibility to continue to monitor and oversee the operation and effect of the new bankruptcy law. The interest was exclusively in "learning how the new Chapter 13 is operating".

Comments "on the operation, procedure, law and effectiveness of Chapter 13" were invited from "those actively involved in bankruptcy matters". Congressman Edwards' letter observed that his subcommittee was "not looking for specific suggestions as to how existing law or procedure should be changed". But he also observed his interest in matters of "philosophy or policy". The Congressman hoped that "comprehensive response" would "contribute immeasurably" to Congress' ability to "evaluate the need, if any, for legislative action". More than 50 bankruptcy judges responded. Their comments and those of others who responded were compiled and printed early this year.[73]

Some bankruptcy judges found inequitable results but refused to follow the lead of some of their colleagues who seemed to have fastened on the chapter their "individual . . . concept of what the law should be". And many of the responses support the view that the *ad hoc* decisions were based on the feelings of the individual judge. Compilation at 3–4, 6, 9, 19, 41, 42, 43, 45, 53, 54, 56, 57, 60, 65, 84, 88, 91, 93, 95, 121.

Almost to a man, the problem of minimal or non-payment plans to unsecured creditors was considered as a matter of a debtor's good faith, usually a factor tied to the broad discharge given to a completed Chapter 13 plan by enacted 11 U.S.C. § 1328(a). Compilation at 4, 6, 8, 10, 13, 19, 24, 42, 43, 44, 45, 47, 49, 50, 51, 54, 56, 60, 61, 97, 103, 117.

Most of these responses counseled Congressional action on good faith or reasonable effort standards, frequently coupled with amendment of the discharge provisions. Compilation at 10, 24, 31, 41, 45, 47, 48, 51, 54, 55, 57, 59, 61, 62, 63, 64, 67, 68, 83, 91, 100, 103.

Some thought Congress might await the full unfolding of the appellate judicial process. Compilation at 14, 21, 41, 49, 53, 65, 66, while a few thought no change was needed. *Ibid*, at 11, 46, 86.

It is therefore against this setting that enacted Chapter 13 must be viewed and this setting must be considered also against Congress' responses in the several as yet unenacted amendments.[74] There can be no doubt that both the House and the Senate have paid heed to those who took Congress at its then word in enacting Chapter 13. That word may be in the process of change

---

71. See *The Effect of an Unsuccessful Attempt to Amend a Statute*, 44 Cornell Law Quarterly 336 (1958).

72. See note 8, *supra*.

73. 96th Cong., 2d Sess., Committee Print, No. 16 (January, 1981). Congressman Edwards' letter and the introduction to this document are at pp. 1 and 2. The compiled responses comprise 124 pages. The Appendix indicated

whence the responses came. It is at pp. 127–8. Hereafter this document will be cited as Compilation.

74. While the Compilation was printed early in 1981, virtually all of the solicited comments came to Congressman Edwards' Subcommittee during the summer of 1980 in answer to his request of June 30th. As already seen, the House approved S.658 in December, 1980.

as experience with it has proved that shortcomings exist, and that Congress' expectations have not been met.

But until such change is made, this court finds no support in either the language or the purpose of enacted Chapter 13 which would exclude from its congenial climate those debtors who, by the spirit and purpose as expressed in the words used, would be given a meaningful fresh start. In short, the "breadth of coverage was vital to its mission". *Powell v. U. S. Cartridge Co.*, 339 U.S. 497, 516, 70 S.Ct. 755, 765, 94 L.Ed. 1017 (1950).

To be sure, the enactment has caused problems. But it is not ambiguous. It might have become uncertain because of the dilemma it poses for bankruptcy judges. Such uncertainty and lack of uniformity in resolving the dilemma will not support statutory revision.

### IV.

■ The three objectants to confirmation of these plans, pp. 6, 8, *supra*, press two theories in support of their objections, apart from their reliance on 11 U.S.C. § 1325(a)(3) that the plans have not been proposed in good faith because of the amounts of the payments promised.

It is said first that apart from everything else, this court has the power under 11 U.S.C. § 1307(c) to dismiss the Chapter 13 or to convert it to a liquidation for cause. See *In re Seman*, 4 B.R. 568, 2 C.B.C.2d 394 (Bkrtcy.S.D.N.Y.1980, Schwartzberg, B. J.). The plan there afforded nothing to unsecured creditors, but did provide for that debtor's single secured creditor. Judge Schwartzberg did not find that the plan was not in good faith. Rather, he found that if no provision is made for unsecured creditors, regardless of a paltry budget which accommodates the secured creditor, cause exists to dismiss or convert. That cause, it was said, is bottomed on a plan which subverts the spirit of Chapter 13 read to mean that a debtor *must* pay something to unsecured creditors.

With deference in every direction to my knowledgeable and dedicated colleague, this court for all the reasons given earlier, cannot accept his view of Chapter 13, nor his basis to invoke 11 U.S.C. § 1307(c). If anything, recourse to the generality of that section leaves us even more at large than has application of the confirmation standard of 11 U.S.C. § 1325(a)(3) which has generated all the controversy. That ground of objection is overruled as is the more familiar one.

Finally, it is said that the plans should be rejected because, on the budgets presented, they are not feasible within 11 U.S.C. § 1325(a)(6). But this is speculation for no evidence is shown that these debtors cannot live within the means they now have, apart from future enhancement of their prospects. Indeed, the budgets seem to reinforce the debtors' good faith efforts to pay what they can afford.[75] This objection is also overruled.

### V.

As no other objections are pending, the Clerk of this Court is directed to prepare orders of confirmation reflecting that the objections have been overruled. It is from those orders that appeals, if any are taken, will lie.

### APPENDIX OF RELEVANT DECISIONS

#### A.

#### CHAPTER 13 PLANS AND DISCHARGEABLE DEBTS

##### I. PLANS NOT CONFIRMED

*In re Cole*, 3 B.R. 346, 1 C.B.C.2d 795 (Bkrtcy.W.Va.1980). Plan paid secured claim in full but made no provision for unsecured debt. Among debts which would be discharged was a judgment for assault. Confirmation was refused for want of "good faith". 11 U.S.C. § 1325(a)(3).

*In re Cook*, 3 B.R. 480, 1 C.B.C.2d 780 (Bkrtcy.W.Va.1980). Plan proposed no pay-

---

**75.** The institutional objectants to Reid Scher's plan have said that where student loans are subject to a Chapter 13 discharge, plans which achieve this should provide for about 90% of such debts. How such a plan would be feasible as to these debtors is not explained.

ments. Debtor barred from Chapter 7 discharge under 11 U.S.C. § 727(a)(8)—6 year bar. Confirmation was refused for want of "good faith".

*In re DeSimone*, 6 B.R. 89, 2 C.B.C.2d 1060 (Bkrtcy.S.D.N.Y.1980). Plan proposed payment of 1% on $20,000. of student loans. Confirmation was refused "for cause", 11 U.S.C. § 1307(c), as contrary to the statutory purpose.

*In re Marlow*, 3 B.R. 305, 1 C.B.C.2d 705 (Bkrtcy.Ill.1980). Plan proposed 1% payment to unsecured creditors among which was a debt based on a false statement not dischargeable outside Chapter 13. Confirmation was refused for want of "good faith".

*In re Murallo*, 4 B.R. 666, 6 B.C.D. 478 (Bkrtcy.Conn.1980). Plan proposed 10% payment of unsecured debt including large student loans. Confirmation was refused for want of "good faith".

*In re Yee*, 7 B.R. 747, 3 C.B.C.2d 388 (Bkrtcy.E.D.N.Y.1980). Plan proposed minimal payment of large student loans. Confirmation was refused for want of "good faith".

## II.  PLANS CONFIRMED

*In re Dills*, 7 B.R. 160, 6 B.C.D. 800 (Bkrtcy.Tenn.1980). Plan proposing 1% payment to unsecured creditors was confirmed, although including a debt created by the debtor's embezzlement, and therefore, not dischargeable.

*In re Eichelberger*, 6 B.R. 705 (Bkrtcy. Miss.1980). Congress intended a broader discharge under Chapter 13 than that available under Chapter 7. The Chapter 13 plan was confirmed as it is not an absence of good faith to take advantage of it to eliminate student loans.

*In re Hudson*, 9 B.R. 363, 3 C.B.C.2d 887 (Bkrtcy.Ill.1981). As there are no provisions to determine dischargeability in Chapter 13, the only standards are 11 U.S.C. § 1325's confirmation standards, here satisfied despite the existence of potentially non-dischargeable debts.

*In re Jenkins*, 4 B.R. 278, 2 C.B.C.2d 129 (Bkrtcy.Colo.1980). Minimal plan con-

firmed over creditor objection that it would receive more on a non-dischargeable debt under Chapter 7. Plan confirmed on theory that "best interests" test of 11 U.S.C. § 1325(a)(4) is satisfied if Chapter 13 plan pays unsecured creditors as much as if the estate were liquidated.

*In re Keckler*, 3 B.R. 155, 1 C.B.C.2d 574 (Bkrtcy.Ohio 1980). Plan proposing 5% payment to unsecured creditors confirmed, which upon completion would discharge a debt created by an embezzlement judgment.

*In re Koerperich*, 5 B.R. 752, 2 C.B.C.2d 1284 (Bkrtcy.Neb.1980). Chapter 13 plan providing no payment to unsecured creditors confirmed over creditor objections that the debts had been found non-dischargeable in a prior 1898 Act bankruptcy proceeding. Plan confirmed on theory that plans filed under the Code do not relate back to the Act, and the good faith requirement of 11 U.S.C. § 1325(a)(3) cannot be used to narrow the discharge provision of 11 U.S.C. § 1328(a).

*In re McBride*, 4 B.R. 389, 2 C.B.C.2d 302, 303 (Bkrtcy.Ala.1980). Chapter 13 plan confirmed despite inclusion of debts non-dischargeable in prior Chapter 7 case. This inclusion does not constitute bad faith as Congress intended to afford greater relief in a Chapter 13 case.

*In re Prine*, apparently not reported. (Bkrtcy.Ala.1980). Minimal plan confirmed containing debt based on debtor's embezzlement, as it is not bad faith to take advantage of a remedy provided by law.

*In re Seely and Cox*, 6 B.R. 309, 2 C.B. C.2d 1128 (Bkrtcy.D.Va.1980). Chapter 13 plan confirmed despite non-dischargeability of debts if debtor had filed under Chapter 7.

### B.

## CHAPTER 13 MINIMAL OR NO PAYMENT PLANS FOR UNSECURED CREDITORS

### I.  PLANS NOT CONFIRMED

*In re Beaver*, 2 B.R. 337, 1 C.B.C.2d 609 (Bkrtcy.La.1980). "Good faith" requires meaningful payments.

*In re Bloom*, 3 B.R. 467, 1 C.B.C.2d 1098 (Bkrtcy.C.D.Cal.1980). Plans offered minimal payments to unsecured creditors. Plans rejected as "illusory", as they did not constitute the debtors' best efforts.

*In re Burrell*, 2 B.R. 650, 1 C.B.C.2d 474 (Bkrtcy.Cal.1980). Plan proposed full payment to secured creditors, 15% to unsecured creditors. Confirmation was refused to further Congressional policy requiring substantial payments and best efforts. A 70% payment was held required. *Reversed* and *remanded*, 6 B.R. 360, 2 C.B.C.2d 1019, (D.C. Cal.1980, Ingram, *D.J.*) Although 11 U.S.C. § 1325 does not require 70% payment of unsecured debts, substantial repayment is required as an element of good faith and remand was ordered for a determination of what constitutes substantial repayment.

*In re Coleman*, 5 B.R. 812, 2 C.B.C.2d 736 (D.C.Ky.1980), affirming Bankruptcy Judge's order refusing to confirm a plan for want of "good faith". The plan offered minimal payment to unsecured creditors but cured defaults on secured indebtedness.

*In re Erwin*, 10 B.R. 138, —— C.B.C.2d —— (Bkrtcy.Colo.1981). Plan scheduled no secured debts and offered $1.00 to four unsecured creditors. Confirmation refused as an illusory plan.

*In re Harbison*, 9 B.R. 205, 3 C.B.C.2d 802 (Bkrtcy.Ill.1981). Plan offered 100% payment to secured creditors. Absent extraordinary circumstances, a 10% offer to unsecured creditors inherently lacks "good faith".

*In re Hobday*, 4 B.R. 417, 2 C.B.C.2d 506 (Bkrtcy.Ohio 1980) Plan offered no payments to unsecured creditors, but offered payments to be made on arrearages on debtor's home mortgage. Confirmation refused as the plan proposed no payments to unsecured creditors thus abusing the purpose of Chapter 13, and therefore lacked "good faith".

*In re Iacovoni*, 2 B.R. 256, 1 C.B.C.2d 331 (Bkrtcy.D.Utah 1980). "Good faith" requires meaningful or substantial payments to unsecured creditors.

*In re Levine*, 10 B.R. 168, —— C.B.C.2d —— (Bkrtcy.Mass.1981). Plan proposed 10% payment to unsecured creditors. Confirmation refused as "good faith" requires meaningful or substantial payments.

*In re Melroy*, 7 B.R. 513, 3 C.B.C.2d 864 (D.C.Cal.1980). "Good faith" requirement assures that each Chapter 13 plan make meaningful payment to unsecured creditors.

*In re Seman*, 4 B.R. 568, 2 C.B.C.2d 394 (Bkrtcy.S.D.N.Y.1980). Plan provided for payment of secured debt and offered nothing to unsecured creditors. Confirmation refused "for cause" under 11 U.S.C. § 1307(c). See p. 65 of the opinion.

*In re Schongalla*, 4 B.R. 360, 2 C.B.C.2d 286 (Bkrtcy.Md.1980). Plan offered 1% payment to unsecured creditors, full payment to secured creditors, 100% on one class of unsecured debts—student loans. A plan proposing minimum payment was held to require utmost "good faith" for confirmation, and here, on the facts, confirmation was refused.

*In re Terry*, 630 F.2d 634 (8th Cir. 1980), *reversing* 3 B.R. 63, 2 C.B.C. 1237 (Bkrtcy. Ark.1980). Plan offered no payment to secured and unsecured creditors. Debtor must make payments under a plan, otherwise there would be an abuse of the more generous discharge of Chapter 13.

*In re White*, 4 B.R. 349, 2 C.B.C.2d 224 (Bkrtcy.Va.1980). Plan proposed 25% to unsecured creditors. For a plan to be proposed in "good faith", it must provide for substantial and meaningful payments to unsecured creditors. This payment was held insubstantial and confirmation was refused.

## II. PLANS CONFIRMED

*In re Clouter*, 3 B.R. 584, 1 C.B.C.2d 909 (Bkrtcy.Colo.1980). Plan offered no payment to unsecured creditors and the decision does not indicate treatment of secured debts. Plan was confirmed because even no payment is not less than the creditor would receive in a Chapter 7 under 11 U.S.C. § 1325(a)(4).

*In re Roy*, 5 B.R. 611, 2 C.B.C.2d 985 (Bkrtcy.Ala.1980). Plan proposed full payment of delinquent taxes and payment to other secured creditors but no payment to unsecured creditors. Such plan does not violate the "good faith" standard when it is the debtor's best effort.

*In re Stollenwerck, Jr.*, 8 B.R. 297, 7 B.C.D. 199 (D.C.Ala.1981). Plan offered full payment to secured creditor, but no payment to unsecured creditor. Payment of $200. per month to secured creditor constitutes "good faith" and plan was properly confirmed.

*In re Thebeau*, 3 B.R. 537, 1 C.B.C.2d 940 (Bkrtcy.Ark.1980). Plan proposed no payment to unsecured creditors. "Good faith" standard does not inevitably require a payment if all elements of 11 U.S.C. § 1325 are established, and such plan may be confirmed.

*In re William Grant Wiggles*, 7 B.R. 373, 6 B.C.D. 1326 (Bkrtcy.Ga.1980). Several plans were reviewed ranging from a no payment plan to a 70% plan for unsecured creditors. The court reviewed the meaning of 11 U.S.C. § 1325(a)(3)'s "good faith" standard and rejected the theory that "good faith" included either a quantitative or a best efforts requirement.

## III. PLANS CONFIRMED BECAUSE OF SPECIAL CIRCUMSTANCES

*In re Bellgraph*, 4 B.R. 421, 2 C.B.C.2d 552 (Bkrtcy.W.D.N.Y.1980). Plan offered 100% to secured creditors, but nothing to unsecured creditors. Debtor was totally disabled and Chapter 13 was only available means to save her home from foreclosure. Plan confirmed.

*In re Curtis, Jr.*, 2 B.R. 43, 1 C.B.C.2d 314 (Bkrtcy.Mo.1979). Plan offered 100% payment on past due child support, and 10% on other unsecured indebtedness. In the absence of exceptional negative circumstances, "good faith" is demonstrated by a 10% payment. Plan confirmed.

*In re Dills*, 7 B.R. 160, 6 B.C.D. 800 (Bkrtcy.Tenn.1980). Plan proposed 10% payment to unsecured creditors. Under prior Chapter XIII, debtor with low income had paid some creditors 50% over a nine year period. These circumstances warranted confirmation.

*In re Hurd*, 4 B.R. 551, 2 C.B.C.2d 190 (Bkrtcy.Mich.1980). Plan offered 5% payment to unsecured creditors and full payment to secured creditors. A good faith plan requires meaningful payment and a 5% payment can only be meaningful under exceptional circumstances. Plan confirmed.

*In re Johnson*, 6 B.R. 34, 2 C.B.C.2d 552 (Bkrtcy.Ill.1980). Plan proposed to cure default on home and offered 1% payment to unsecured creditors. Chapter 13 is a tool to preserve a home from foreclosure. Plan confirmed.

*In re Keckler*, 3 B.R. 155, 1 C.B.C.2d 574 (Bkrtcy.Ohio 1980). Plan proposed 5% payment to unsecured creditors. Debtor was a full-time student with a criminal record. Chapter 13 was the only way to discharge an otherwise non-dischargeable money judgment for embezzlement.

*In re Moss*, 5 B.R. 123 (Bkrtcy.Tenn.1980). Plan proposed 1% to unsecured creditors. This plan was confirmed after a determination that Chapter 13 afforded the best available method for the debtor to pay $10,-000 in back taxes.