**In re Paul Eugene BURRELL, Debtor.**

**No. C 80–4248 TEH.**

United States District Court, N.D. California.

Feb. 11, 1982.

Robert L. Ward, Siegfried Hesse, Oakland, Cal., for appellant.

Law Offices of John T. Hansen, John T. Hansen, Richard E. Driscoll, San Francisco, Cal., for debtor amici curiae in pro per.

## ORDER

THELTON E. HENDERSON, District Judge.

This appeal follows a decision of the bankruptcy court, denying on remand, confirmation of a plan for the adjustment of a wage earner's debts under Chapter 13 of the Bankruptcy Act of 1978, 11 U.S.C. § 1301, *et seq.* ("Act").* This court has jurisdiction over this matter pursuant to § 405(c)(1) and (2) of the Act. Having carefully considered the papers submitted and the arguments of counsel,

THIS COURT HEREBY ORDERS that the decision below is reversed.

On December 6, 1979, Paul Eugene Burrell, the debtor, filed a petition for relief under Chapter 13 of the Bankruptcy Act and submitted a plan proposing to pay $450.00 per month for 36 months to the trustee of the bankruptcy court. The plan provided for payment in full for all priority and administrative claims and secured claims to the value of the security. It also provided that unsecured creditors would be paid fifteen percent of the allowed unsecured claims.

The Chapter 13 trustee reviewed the debtor's petition, plan, and schedules, and at the creditor's meeting held pursuant to § 341, examined the debtor under oath. Based on this evidence, he approved and recommended confirmation of the plan. No creditors offered opposition.

---

* Chapter 13 of the Bankruptcy Act of 1978 should be distinguished from Chapter XIII of the former Bankruptcy Act.

The standards governing confirmation of Chapter 13 plans are set forth in § 1325(a), which provides:

(a) The court shall confirm a plan if—

(1) the plan complies with the provisions of this chapter and with other applicable provisions of this title;

(2) any fee, charge or amount required under chapter 123 of Title 28, or by the plan, to be paid before confirmation, has been paid;

(3) the plan has been proposed in good faith and not by any means forbidden by law;

(4) the value, as of the effective date of the plan, of property to be distributed under the plan on account of each allowed unsecured claim is not less than the amount that would be paid on such claim if the estate of the debtor were liquidated under Chapter 7 of this Title on such date;

(5) with respect to each allowed secured claim provided for by the plan—

(A) the holder of such claim has accepted the plan;

(B)(i) the plan provides that the holder of such claim retain the lien securing such claim; and

(ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim; or

(C) the debtor surrenders the property securing such claim to such holder; and

(6) the debtor will be able to make all payments under the plan and to comply with the plan.

The bankruptcy court found that Burrell's plan satisfied all of the objective criteria of § 1325(a), including § 1325(a)(4), the so-called "best interests of the creditors test," but denied confirmation. It held that § 1325(a) implicitly requires that a plan propose substantial payments to unsecured creditors, *In re Burrell,* 2 B.R. 650, 652 (Bkrtcy.N.D.Cal.1980), and that Congress intended to define substantial payments as 70 percent or more of the allowed unsecured claims. *Id.* at 653.

Burrell appealed, and the District Court reversed and remanded, holding that no statutory basis exists for the imposition of an inflexible 70 percent repayment requirement. *In re Burrell,* 6 B.R. 360, 365 (D.C.N. D.Cal.1980). However, the court did find that the legislative history of § 1325 supports consideration of the substantiality of the payments and the debtor's best efforts as elements of the "good faith" requirement of § 1325(a)(3). According to the court, the good faith determination should be made on a case-by-case basis, giving consideration to the entire circumstances of the debtor.

On remand, the sole issue was whether the plan met the substantiality requirement. Without making subsidiary findings or analyzing the various factors suggested by the District Court, the bankruptcy court found that the proposed fifteen percent plan did not provide substantial payments to the unsecured creditors and denied confirmation. This appeal followed.

Appellant contends that both the bankruptcy court and the District Court erred in placing a quantitative gloss on the good faith provision of § 1325(a)(3). According to appellant, both the plain language of § 1325(a) and the legislative history dictate the conclusion that § 1325(a)(4) provides the only quantitative requirement for payments to unsecured creditors. The appellant further argues that the bankruptcy court abused its discretion by *sua sponte* denying confirmation of his plan. We will consider these issues separately.

I

*The court erred in placing a quantitative gloss on § 1325(a)(3).*

In enacting the Bankruptcy Act of 1978, Congress sought to breathe new life into Chapter 13. According to the report of the House Judiciary Committee, H.R.Rep. No. 95–595, 95th Cong. 1st Sess. (1977) p. 118, U.S.Code Cong. & Admin.News, pp. 5787, 6078,

(T)he premises of the bill with respect to consumer bankruptcy are that use of the

bankruptcy law should be a last resort; that if it is used, debtors should attempt repayment under Chapter 13, Adjustment of Debts of an Individual with Regular Income . . .

The purpose of Chapter 13 is to enable an individual, under court supervision and protection, to develop and perform under a plan for repayment of his debts over an extended period.

Under the former Bankruptcy Act, Chapter XIII had limited usage for several reasons. Perhaps the most significant was the difficulty of obtaining creditor approval. Even a plan proposing 100 percent repayment of unsecured claims required majority creditor approval and one proposing less required unanimous consent.

In contrast, new Chapter 13 provides many reasons for a debtor to choose to develop a plan of repayment rather than to opt for liquidation under Chapter 7.

It [Chapter 13] permits the debtor to protect his assets. In a liquidation case, the debtor must surrender his nonexempt status for liquidation and sale by the trustee. Under Chapter 13, the debtor may retain his property by agreeing to repay his creditors. Chapter 13 also protects a debtor's credit standing far better than a straight bankruptcy, because he is viewed by the credit industry as a better risk. In addition, it satisfies many debtors' desire to avoid the stigma attached to straight bankruptcy and to retain the pride attendant on being able to meet one's obligations. The benefit to creditors is self-evident: their losses will be significantly less than if debtors opt for straight bankruptcy.

H.R.Rep. No. 95–595, *supra,* at p. 118, U.S. Code Cong. & Admin.News, p. 6079. Chapter 13 also allows debtors to extend tax claims over 36 months, to modify and extend secured debt obligations (so-called "secured debt cram-down"), and to discharge debts which would not otherwise be dischargeable under Chapter 7.

In designing the Act, Congress determined that the inadequacy of relief provided for consumer debtors was one of the major problems plaguing the then existing Bankruptcy Act. H.R.Rep. No. 95–595, *supra,* at pp. 4–5. Congress intended to make "bankruptcy a more effective remedy for the unfortunate consumer debtor." *Id.* Accordingly, although we recognize that the Act was not primarily a debtor's bill, it is clear that its provisions must be read with this strong remedial purpose in mind.

Unfortunately, the legislative history aids little in interpreting what Congress meant by the particular phrase "good faith." It is not defined in either the Bankruptcy Code or Congressional reports. *In re Garcia,* 6 B.R. 35, 38 (Bkrtcy.D.Kan.1980); 5 *Collier on Bankruptcy* § 1325.01(2)(c) (15th ed. 1979). Nonetheless, in support of finding a minimum quantitative requirement implicit in § 1325(a)(3), some courts have relied on portions of committee reports encouraging 100 percent repayment plans or indicating that the provisions of Chapter 13 should not be abused. *Burrell, supra,* 6 B.R. at 364.

As the court observed in *Matter of Scher,* 12 B.R. 258, 274 (Bkrtcy.S.D.N.Y.1981):

Yet, so many of us, uncomfortable with what Congress did, have tried to fashion some equitable rationale to defeat plans offering nothing or minimal amounts to unsecured creditors. Some of us have defeated plans regardless of how amply the debtor's plight has forced him to treat his mortgage and/or other secured creditors. And the "good faith" of the plan was and continues to be the vehicle.

For a complete summary of the condition of the case law defining "good faith," *see Scher, supra,* at 280–83. *See also, In re Beaver,* 2 B.R. 337, 340 (Bkrtcy.S.D.Cal. 1980) (meaningful payments); *In re Curtis,* 2 B.R. 43, 45 (Bkrtcy.W.D.Mo.1979) ("at least 10% of take home pay"); *In re Iacovoni,* 2 B.R. 256 (Bkrtcy.D.Utah 1980) ("meaningful payments but less than best efforts"); *In re Campbell,* 3 B.R. 57, 59–60 (Bkrtcy.S.D.Cal.1980) ("substantial payment depending on the facts of the case"); *In re Howard,* 3 B.R. 75, 77 (Bkrtcy.S.D.Cal.1980) ("substantial payment").

■ To the extent that legislative history aids interpretation, this Court believes that

it supports the conclusion that "good faith" is not quantifiable. The more direct and unequivocal statements strongly suggest that Congress intended the only floor under § 1325(a) to be that set forth in § 1325(a)(4): the liquidation value of the debtor's nonexempt assets.

> The bill requires only that creditors receive under the plan more than they would if the debtor went into straight bankruptcy.

H.R.Rep. 95–595, *supra,* at 123–124, U.S. Code Cong. & Admin.News, pp. 6084–6085. *See also Scher, supra.* Accordingly, some courts have refused to quantify the requirement in § 1325(a)(3). *See, e.g., Scher, supra; In re Stollenwerck,* 8 B.R. 297 (D.C.D. Ala.1981); *Matter of Wiggles,* 7 B.R. 373 (Bkrtcy.N.D.Ga.1980). At least a few have concluded that even "zero" or minimal repayment plans can be confirmed if all other requirements are met. *See In re Cloutier,* 3 B.R. 584 (Bkrtcy.D.Colo.1980). *In re Thebeau,* 3 B.R. 537 (Bkrtcy.E.D.Ark.1980); *In re Keckler,* 3 B.R. 155 (Bkrtcy.N.D.Ohio 1980).

We agree with these courts that "good faith" is not quantifiable within the meaning of § 1325(a), not only because of legislative pronouncements prior to the Act's passage, but also the plain language of § 1325(a), the meaning of "good faith" when used as a term of art, and legislative history subsequent to the Act's passage. These issues are discussed below.

1) *The plain language and structure of § 1325(a) require the conclusion that § 1325(a)(4) sets forth the sole minimum quantitative repayment requirement for Chapter 13 plans.*

■ Although courts have the power to construe legislation, they are not authorized to alter the plain meaning of a statute.

> While a court may have latitude to construe ambiguous legislation and while that latitude may encompass the ability to effectuate the intention of a legislative body, I do not believe such authority grants a court the power to alter the clear language of a statute in the name of interpretation or enlightenment.

> While a court may construe a statute in order to avoid absurd or wholly impractical consequences, I believe it is a wholly different matter to substitute the judgment of a judge for that of Congress on the question of whether the treatment of creditors in Chapter 13 is absurd.... The treatment of creditors is a matter of legislative policy and not a subject of judicial concern.

*In re Jenkins,* 4 B.R. 278, 279–80 (Bkrtcy.D. Colo.1980). In the recent case of *In re Geiger Enterprises, Inc.,* 454 U.S. 354, 102 S.Ct. 695, 70 L.Ed.2d 542 (1982), the Supreme Court reversed the Court of Appeals for making an interpretation of another section of the Bankruptcy Code which, although reaching a practical result, was inconsistent with the language of the statute. The court stated:

> 'It is elementary that the meaning of a statute must, in the first instance, be sought in the language in which the act is framed, and if that is plain, and if the law is within the constitutional authority of the law-making body which passed it, the sole function of the courts is to enforce it according to its terms.' *Caminetti v. United States,* 242 U.S. 470, 485 [37 S.Ct. 192, 194, 61 L.Ed. 442] (1917). While the Court of Appeals may have reached a practical result, it was a result inconsistent with the unambiguous language used by Congress ...

In the same way, quantifying the "good faith" requirement of § 1325(a)(3) would be inconsistent with the plain language and structure of § 1325(a). Section 1325(a) sets forth six express criteria that a plan must satisfy and mandates confirmation if they are met. Under § 1325(a)(1), priority and administrative claims must be paid in full. Section 1325(a)(2) requires that court costs be paid in full, and § 1325(a)(5) allows debtors three different methods for satisfying secured creditors' claims. Finally, § 1325(a)(4) provides that unsecured creditors must be paid at least as much as they would receive if the debtor's estate had been liquidated under Chapter 7. Thus, § 1325(a) is structured to provide separate

and full treatment in the individual subsections for each class of creditors. Given this carefully drafted structure, we see no basis for attaching a further quantitative requirement for the payment of unsecured creditors to the "good faith" provision of § 1325(a)(3), especially in light of the fact that in common usage "good faith" is not measured quantitatively.

Our analysis is further supported by a number of well-reasoned cases. In *Matter of Wiggles,* 7 B.R. 373 (Bkrtcy.N.D.Ga. 1980), the court held, *inter alia,* that the term "good faith," as used in § 1325(a)(3), does not include a minimum quantitative payment requirement of any kind. Reasoning that the various subparagraphs of § 1325(a) describe confirmation standards of a different nature, class and character, the court stated,

> It can readily be recognized that subparagraph (3) and subparagraph (4) of Section 1325(a) describe confirmation standards of a different nature, class, and character. Subparagraph (4) determines the extent of economic payment which the debtor's plan must provide to the creditors; i.e., no less than they would receive in Chapter 7. While the Code and legislative reports indicate a congressional expectation that the Chapter 13 debtor plan will provide for payment of the value of the collateral to each secured claimant and for some payment to unsecured creditors, and that Chapter 13 will provide encouragement to the debtors to file extension or composition plans for the payment of debts rather than Chapter 7 liquidations, nevertheless, Section 1325(a)(4) is the only statutory requirement dealing with the quantitative extent of payment to creditors incident to confirmation of a plan. Any attempt to read into the term "good faith" other quantitative payment standards similar to "meaningful payment," "substantial payment" or "best effort" to unsecured creditors is not warranted by the Bankruptcy Code.

*Id.* at 378. The court then concluded that "good faith" means honesty of purpose and full and complete disclosure. *Id.* at 380. *In re Sadler,* 3 B.R. 536, 537 (Bkrtcy.E.D.Ark.

1980), and *In re Stollenwerck, supra,* at 299, say much the same thing. *See also In re Cloutier,* 3 B.R. 584, 586 (Bkrtcy.D.Colo. 1980) and *In re Terry,* 3 B.R. 63 (Bkrtcy.W. D.Ark.1980).

Finally, as Judge Babbitt explained in *Matter of Scher, supra,* 12 B.R. at 275:

> (T)he content the judges have given to the phrase "good faith" finds no support in the scheme of Chapter 13, nor in its language, nor in its legislative history. There is utterly no basis for judges to read some kind of percentage of debt figure for unsecured creditors into Chapter 13 where Congress did not do so, and to find want of good faith in order to defeat a plan because of private notions of what is right or wrong or what should or should not be.

We agree.

### 2) *"Good faith" is a term of art.*

■ The requirement that bankruptcy petitions be filed in "good faith" has been in the Bankruptcy Code for many years. *See Matter of Wiggles, supra,* 7 B.R. at 376–77. According to *Collier on Bankruptcy,* 14th Ed., Vol. 10, Sec. 29.06, p. 339, this requirement was met by the debtor's refraining from abusing the provisions, purposes or spirit of Chapter XIII and by not using improper measures to procure acceptances. *See also, In re McMinn,* 4 B.R. 150, 152 (Bkrtcy.D.Kan.1980). Consequently, the fact that Congress failed to provide any explanation in either the Code or the legislative history for what it meant by the term "good faith" strongly suggests that it did not intend to alter the meaning which that term already had acquired. We take this as another persuasive indication that Congress did not intend to attach any quantitative meaning to the "good faith" provision of § 1325(a)(3).

### 3) *Subsequent legislative history.*

Although we recognize the danger inherent in inferring the intent of Congress from expressions made after a bill is enacted, *see Matter of Scher, supra,* 12 B.R. at 278–79, the legislative history subsequent to the

passage of the Bankruptcy Reform Act of 1978 explicitly validates our analysis and leaves no doubt that "good faith" has no quantitative implication. On several occasions since the passage of the Act, Congress has attempted to amend § 1325(a) to require some minimum quantitative payments to unsecured creditors. In 1980, the House of Representatives proposed that a "good faith effort" requirement be added to § 1325(a)(3) so that the section would read:

> (3) the plan has been proposed in good faith and not by any means forbidden by law *and represents the debtor's good faith effort.*

H.R.Rep. No. 96–1195, 96th Cong., 2d Sess. (1980), accompanying S. 658. In explicating the "good faith effort" requirement, the House Report explains that the "good faith proposal" test of § 1325(a)(3) was intended to bar confirmation only where the plan would contravene the purposes or spirit of Chapter 13:

> The good-faith proposal of a plan by the debtor envisioned by the first clause of subparagraph 1325(a)(3) is meant to bar the confirmation of a Chapter 13 plan where the debtor either does not intend to effectuate the plan as proposed or where the proposed plan, if consummated, would contravene the spirit or purposes of Chapter 13. For instance, a debtor is not entitled to confirmation of any plan a principal purpose of which is to render the debtor incapable of meeting enforceable legal obligations for the support and maintenance of a former spouse or dependent children.
>
> The "good-faith effort" test incorporates as a separate prerequisite to the confirmation of a Chapter 13 plan the requirement that the aggregate payments proposed under the plan represent a good-faith effort on the part of the debtor to satisfy the claims of creditors during the pendency of the plan consistent with the ability of the debtor to make payments under a Chapter 13 plan. In short, the "good-faith effort" test looks to the present and future ability of the debtor to make payments into the Chapter 13 creditors' fund during the course of the

plan, while the traditional "good-faith" test examines the intentions of the debtor and the legal effect of the confirmation of a Chapter 13 plan in light of the spirit and purposes of Chapter 13.

H.R.Rep. No. 96–1195, *supra,* at 24–25.

Likewise, the Senate has stated explicitly that Congress did not intend to create a numerical test for "good faith." S.Rep. No. 97–150, 97th Cong., 2d Sess. (1981), accompanying S. 863 (proposing to amend § 1325(a)(4) to add a "bona fide effort" requirement), specifically states that those cases finding a quantitative requirement in § 1325(a)(3) misconstrue congressional intent:

> Under the new law, too often instead of meaningful payments to unsecured creditors, the norm, has become "zero" or nominal payment plans in many jurisdictions. In other areas, judges have had to strain the provisions of Section 1325 by decision or informal rule to reach the right result vis-a-vis the level of payments of a debtor for the particular case.
>
> Many courts have construed the good-faith language, Section 1325(a)(3), to this end, which was not intended by Congress in enactment of that requirement. The good-faith requirement of that section is meant to bar confirmation of a Chapter 13 plan where the debtor either does not intend to effectuate the plan as proposed or where the proposed plan is for a purpose not permitted under Title 11. For instance, a debtor is not entitled to the confirmation of any plan the principal purpose of which is to render the debtor incapable of meeting legal obligations for the support and maintenance of a former spouse or dependent child.

*Id.* at 22.

■ Given these legislative statements, the plain language and structure of § 1325(a), and the use of "good faith proposal" as a term of art, we conclude that Congress did not intend to attach a quantitative meaning to the "good faith" provision of § 1325(a)(3). Furthermore, granting due deference to clear congressional

expressions of intent and the meaning of "good faith" as a term of art, we also conclude that the "good faith proposal" requirement is meant to bar confirmation of a Chapter 13 plan only when the proposed plan would be an abuse of the provisions, purposes, or spirit of Chapter 13. A plan is not proposed in good faith if, for instance, the debtor does not intend to effectuate the plan as proposed, is proposing the plan to render the debtor incapable of meeting spousal or child support obligations, or is attempting to use the bankruptcy law as part of a scheme to supply a judicial cover for a fraudulent design.

■ In the case at hand, the bankruptcy court denied confirmation of the debtor's plan for the sole reason that it did not offer "substantial" payments to unsecured creditors. There was no evidence which suggested that the debtor's plan was an attempt to abuse the spirit of Chapter 13. On the contrary, the opposite appears to be true. Burrell had ten secured creditors holding claims totalling $13,669.00, whose security had a value of approximately $4,900.00. He chose to resolve his financial straits by retaining his property and paying the secured creditors the cash value of their security pro-rata over three years. That is consistent with the purposes of Chapter 13.

Under the circumstances of this case, we find that debtor Burrell's plan was proposed in good faith. Accordingly, we reverse the judgment of the bankruptcy court and order confirmation of the debtor's plan.

## II

*The bankruptcy court abused its discretion by sua sponte denying confirmation of the debtor's plan.*

Although the issue of good faith resolves this case, we also find that the bankruptcy court abused its discretion under the new Act by *sua sponte* denying confirmation of the debtor's plan.

Under the former Bankruptcy Act, bankruptcy judges were intimately involved in the day-to-day prosecution, supervision and administration of proceedings pending in their courts. They were not simply the arbiters of disputes framed by others and brought before them for resolution. Their consequent dual role, however, seriously compromised the fairness of the bankruptcy system and stimulated legislative concern. The House Report described the problem as follows:

Bankruptcy judges administer the present bankruptcy system, and are responsible for the administration of individual bankruptcy cases. Their administrative, supervisory, and clerical functions in these matters are in addition to their judicial duties in bankruptcy cases. The situation is in marked contrast to most litigation, in which the parties themselves manage the progress of the case. The judge does not become involved in the case, and if a party fails to take action, the judge does not intercede on his behalf. Instead, the party is foreclosed.

The practice in bankruptcy is different...' In bankruptcy cases ... active supervision is essential, Bankruptcy affects too many people to allow it to proceed untended by an impartial supervisor.

The bankruptcy judges have stepped in to perform the supervisory role because of the dearth of creditor participation....

It is enough of a reason for change that these functions and duties of the bankruptcy judge constitute no part of his judicial responsibility, and divert him from the important judicial and legal work that must be done in bankruptcy cases. However, if that were the system's only vice, adjustments less than those proposed in the bill might suffice. Deeper problems arise because of the inconsistency between the judicial and administrative roles of the bankruptcy judges. The inconsistency places him in an untenable position of conflict, and seriously compromises his impartiality as an arbiter of bankruptcy disputes.

H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 88–89 (1977), U.S.Code Cong. & Admin. News, pp. 6049–6050.

In response to these sentiments, the new Bankruptcy Act drastically restructured the old bankruptcy system and altered the traditional role of bankruptcy judges. Under the new Code, judges are "passive arbiters of disputes that arise in bankruptcy cases." *Id.* at 107, U.S.Code Cong. & Admin.News, p. 6069. The judges' administrative functions have been shifted to the United States trustees who are now the executives of the bankruptcy system. *Id.* at 110.

> The United States trustees will relieve the bankruptcy judges of their current administrative and supervisory role, and will become the principal administrative officers of the bankruptcy system. Bankruptcy judges, relieved of administrative responsibilities, will take a more passive role, consistent with their judicial responsibilities, which will serve to eliminate the institutional bias that exists in the bankruptcy system today.

*Id.* at 101, U.S.Code Cong. & Admin.News, p. 6063.

The trustees have authority to proceed with proposed actions in the absence of objection by interested parties. Only when a party objects will the court hear the dispute generated and decide whether to authorize or prohibit the trustee's proposed action. *Id.* at 108.

In the instant case, the trustee reviewed the debtor's plan, examined him under oath, and approved and recommended confirmation of the plan. And though no creditors offered any opposition, the bankruptcy court, *sua sponte,* denied confirmation.

■ Although under § 1325(a) the bankruptcy court's confirmation of a proposed Chapter 13 plan is necessary, even in the absence of objection by creditors or the trustee, determining compliance with the provisions of § 1325(a) is essentially an administrative task. In the absence of facial non-compliance with § 1325(a), it would be inconsistent with the judicial role established by Congress for a judge, on his own motion, to deny confirmation of a proposed plan to which neither the creditors nor the trustee objects. In a similar context, the court in *Matter of Wiggles, supra,* 7 B.R.

373, held that a bankruptcy court may not *sua sponte* dismiss a Chapter 13 petition. *Id.* at 383, n. 38–384.

■ In the present case, the District Court remanded to the bankruptcy judge solely because it could not determine as a matter of law whether a fifteen percent payment plan constituted substantial payments under the circumstances of the case. *In re Burrell, supra,* 6 B.R. at 366. Thus, even under the District Court's interpretation of § 1325(a)(3), the debtor's proposed plan did not fail to comply on its face with § 1325(a). We therefore find that it was an abuse of the bankruptcy court's discretion to deny confirmation of the debtor's plan, and, accordingly, we also reverse for this reason.

■ We also in closing note that in the short opinion accompanying his order, the bankruptcy judge responded to the debtor's argument that the lack of creditor objection should support confirmation of the plan. The opinion seemed to suggest that a lack of creditor opposition can be equated with a lack of evidence of creditor consent. But that is not so. As appellant contends, if this portion of the court's opinion were applied literally, it would reverse the congressional determination to eliminate creditor approval as a prerequisite to confirmation of a plan under Chapter 13. No doubt exists about congressional intent in this regard:

> The standards for confirmation of the plan differ from those under current law in two significant respects. First, the bill does not require consents from unsecured creditors. Under present law, the consent requirement often prevents a debtor from making a legitimate offer of less than full payment, for fear that the offer will not obtain the requisite consents. Instead, the debtor, unable to pay his debts in full within a reasonable period, will opt for liquidation. The bill requires only that creditors receive under the plan more than they would if the debtor went into straight bankruptcy. Debtors will be able to make a more realistic appraisal

of their finances, and will be able to propose a plan under which they can succeed. Creditors will not be disadvantaged, because the plan must still pay them more than they would get under a liquidation.

H.R.Rep. No. 95–595, *supra,* at 123–24, U.S. Code Cong. & Admin.News, pp. 6084–6085.

Accordingly, the decision of the bankruptcy court is reversed and remanded with instructions to order confirmation of the debtor's plan.

IT IS SO ORDERED.